Coquillard's Adm'r *v.* Bearss et al.

*Per Curiam.*—The judgment is reversed, with costs. Cause remanded.

*H. D. Thompson, Walter March* and *W. R. Pierce,* for the appellant.

*J. Brownlee,* for the appellee.

--------⁘--------

*Bad headnote. No Champerty*

COQUILLARD'S Adm'r *v.* BEARSS *et al.*

PROSECUTION OF CLAIMS AGAINST GOVERNMENT.—A claimant against the government has a clear right to appear, in person or by attorney, before a legislative committee, to openly and fairly present the facts and arguments upon which he relies for recovery.

SAME.—But it is against public policy and unlawful to present such facts and arguments secretly, or to resort to "log rolling," or deceit, or undue means, or bribery, or other corrupting influences, in order to secure desired legislation.

SAME—CHAMPERTY—A contract to prosecute a claim against the government, for another person, and pay all expenses, and to receive, as compensation therefor, a certain portion of the amount recovered, if successful, and nothing if not successful, is champertous and wholly void.

APPEAL from the *Miami* Circuit Court.

HANNA, J.—Action by the appellant against the appellees, based upon the following letter:

"*Peru, September 29,* 1849.

"*Mr. A. Coquillard*—SIR: Your letter of the 13th instant was received several days since, in which you propose making a trial to collect the claims against the *Pottawotamie* Indians allowed by Gen. *Mitchell.* I consulted my brother, *Ephraim Bearss,* and we concluded to offer your twenty-five per cent.

for collecting on whatever amount you may get the government to assume, or any arrangment that can be made so as to secure to us the remaining three-fourths.

"If you can collect or secure to us our claims as above, you may do so, and this will authorize you to act in the matter for us and in our names, the same as we could were we there ourselves. If you can succeed, twenty-five per cent. will pay you well, and it will not leave much for us. If you don't succeed, we are not to be at any expense.

"If a power of attorney is necessary, we are willing to give you one, but are not willing to pay much out upon uncertainty.

"If you conclude to attend to our claims, please write us and let us know. 　　　Very respectfully,

　　　　　　　　　　　"D. R. Bearss,
　　　　　　　　　　"Ephraim Bearss,
　　　　　　　　　　　"Per *D. R. Bearss.*"

"*A. Coquillard, South Bend.*"

The complaint avers that, at the date of the letter the appellees having certain claims against the *United States* Government, growing out of certain transactions with the *Pottawotamie* Indians, amounting to the sum of 993 dollars and 12 cents, which had been allowed by Gen. *Mitchell,* Indian agent, and reported to the Indian Department as just and valid, made the agreement set out, whereby the appellees agreed that, if the decedent would collect and secure said money, they would pay him the sum of twenty-five cents on the dollar on the amount so collected and secured; that the decedent accepted the offer, and proceeded at his own expense to *Washington City,* and employed agents and attorneys to assist him in preparing and laying before the proper officers and committees the evidence of the "plaintiffs" identity and the validity of said claims, and laid out large sums of money

Coquillard's Adm'r *v.* Bearss et al.

in relation thereto ; and by his care and diligence in the premises secured from the government and caused said sum to be paid to the appellees; that said service was performed about the 1st day of *October*, 1850, by securing the passage by Congress of an act of appropriation for that purpose, and afterwards, to-wit: on the first day of *December*, 1850, by the receipt by the appellees of the sum so appropriated by the said act; that on the 11th day of *November*, 1850, the decedent made a special demand upon the appellees for said commission, which they refused to pay; that to delay the said decedent in the collection of said per centage, the said defendants, after the appropriation by Congress, refused to recognize their contract, and drew the money and appropriated it to their own use; that they drew the same with the intent to unreasonably delay the payment of the same, wherefore the appellant asked that the appellees might be charged with interest from the day of demand, to-wit: *November* 11th, 1850.

The appellant further avers that during said transactions, said decedent was not an attorney or solicitor, nor did he hold any office under the *United States* Government, nor were his services performed before any court of law or equity, either State or Federal; that he acted as a private citizen, and in no other capacity than as said *Bearss'* agent.

To this complaint a demurrer was filed and sustained, which presents the only question in the record.

In the prosecution of claims against the government, before a Legislative body, there are certain things that can be legitimately and properly performed in aid thereof; and certain other things that can not. As in a Court of justice, so in a Legislative committee or assembly, we suppose, a person may, if permitted, appear by himself or attorney to openly and fairly present the facts and arguments upon which he

relies. *Marshall* v. *The Baltimore and Ohio Railroad Company*, 16 Howard 337; 2 Pars. on Contracts 361.

But he can not do even this secretly, nor resort to "log rolling," nor to deceit or undue means, nor promises of personal advantage or benefit to members, or by bringing to bear other corrupting influences.

We have carefully examined the writing herein declared on, and the averments in the complaint, and we are not able to perceive that the deceased engaged or undertook to resort to any of the means or appliances that would render his action illegal. The presumption would be that he was employed and engaged to take an honest course in forwarding the interest of his employers.

This would dispose of the case if the defendants had agreed to pay the deceased a fixed sum; but as the agreement was for a part of the claim, the payment of which he was employed to obtain, the question is, whether that invalidated such agreement. It is argued that it did, on the ground that such agreement was champertous, or against public policy.

On the other hand it is urged that, the laws in reference to champerty have relation only to proceedings in courts of justice, and do not apply to legislative action, or the means used to produce the same, or contracts in regard thereto.

We will notice definitions of the term or offence: "Champerty—A bargain with a plaintiff or defendant, *campum partire*, to divide the land or other matter sued for between them, if they prevail at law, the champertor undertaking to carry on the suit at his own expense." 1 Bouvier's Law Dict. See also 1 Pick. 416; 4 Litt. 117; 5 John. Ch. R. 44; 7 Port. 488.

"Champerty—A bargain with the plaintiff or defendant in any suit to have part of the *land, debt,* or other thing sued for, if the party that undertakes it prevails therein; whereupon the champertor is to carry on the party's suit at his own expense." 1 Jacob's Law Dict. See also 1 Inst. 368.

Coquillard's Adm'r *v.* Bearss et al.

The definition given by *Blackstone* is in the same language used by *Bouvier.* 3 Commt. 135.

It is possible that as to its general signification a broader definition may be given to the word, in view of its derivations. Webster's Dict.; Bouvier's Dict.; Jacob's Dict. But when used in connection with matters of law or legal proceedings, it would appear to have reference technically to suits, &c., in courts. It would follow that the criminal offence of champerty could not be committed in prosecuting a claim before a legislative body for a part of the sum to be obtained. The question, whether it is so far against public policy as to render the contract void, remains to be examined.

At the time the contract herein was made and the services rendered, we are not aware that there was any statute upon the subject. There was one passed in 1853; 10 Stat. at Large 170; forbidding certain persons therein designated from engaging in the prosecution of claims against the government; but it does not appear that the deceased fell within the prohibition—indeed such fact is negatived by the averments in the complaint. As to statutory enactments, the contract was not illegal. Was it on general principles? It is said in the case cited in 16 Howard, that " public policy and sound morality do imperatively require that courts should put the stamp of their disapprobation on every act, and pronounce void every contract, the ultimate or probable tendency of which would be to sully the purity or mislead the judgments of those to whom the high trust of legislation is confided." 334. In the case just cited the contract was not enforced, and it is argued that, " bribes in the shape of high contingent compensation, must necessarily lead to the use of improper means and the exercise of undue influence." In the case the Court cites, *Fuller* v. *Dame,* 18 Pick. 472; *Hatzfield* v. *Gulden,* 7 Watts 152; *Clippinger* v. *Hepbaugh,* 5 Watts and Sergt. 315; *Wood* v. *McCan,* 6 Dana 366; *Hunt* v. *Test,* 8 Alabama 719; *Com-*

*monwealth* v. *Callaghan*, 2 Virginia cases 260, and says: "The sum of these cases is, 1. That all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislation, are void by the policy of the law." *Id.* 366. This suming up of what the Court understood to be the purport of those cases is, as we view it, in terms of approval of the legal position so understood to be declared in those cases. It is true that, in the case then being discussed, the facts showed that the contract was based upon an understanding that undue means were to be resorted to in procuring legislation, and large contingent compensation was dependant upon success. This may have colored the language employed in the opinion, but could not change the principle decided.

In the case at bar there is nothing showing that any undue means were to be used. But it is either right or wrong to agree for compensation contingent upon success in procuring legislative action.

The burden of the argument, in the case cited from the highest court in the nation, it appears to us is, that such agreements are against public policy. This accords with our views of both the morality and legality thereof. It is conceded that legislation was necessary in reference to the claims, payment of which was being sought.

*Per Curiam.*—The judgment is affirmed, with costs.

*D. P. Baldwin*, for the appellant.[1]

*Thomas A. Hendricks* and *Oscar B. Hord*, for the appellees.[2]

(1) The counsel for the appellant argues:

The decision in *Scobey* v. *Ross*, 13 Ind. 117, does not touch the present case, because *champerty applies only to* suits pending or about to pend in courts of justice, or the use of their machinery, in consideration of having a share of the subject matter of the litigation. In the case at bar the services contracted for were not to be performed in any Court, State or national. The *United States* can not be sued.

Coquillard's Adm'r *v.* Bearss et al.

The only way to enforce a right against it or obtain redress of grievances is by petition and argument, and in no sense can such an application be called a suit. There is none of the machinery of courts about it; no lawyers, no pleadings, no appeals. Champerty is devised to preserve the integrity of the judicial department of the government, and as such is no doubt salutary. But in the legislative it is unknown. There the only contracts that the law sets its hand upon are those designated by the term "lobbying." A man may employ agents and attorneys to produce evidence of the validity of his claims to identify himself and his papers; nay, to work upon the ear of committees by argument and entreaty, and the law will uphold the agreement, and has so done thousands of times. In *England* practice before legislative committees has grown into a recognized profession In the case at bar it will be noted that the claims in question had been adjudicated upon by the *United States* agent, Gen. *W. B. Mitchell*, and all that remained was to have Congress recognize the same by an appropriation. In the recent case of *Sedgwick* v. *Stanton*, 4 Kernan N. Y. Rep. 289, this whole subject is thoroughly discusssed. That was an agreement to engineer a title through the Board of Canal Commissioners and receive in consideration of such services one-half the land so obtained. The Court draw the line very clearly between applications to the Legislature and applications to its Courts, holding that in the former case a contract for such services would be valid, in the latter champertous by the common, although not by statutory law of that State. We press upon the attention of this Court that discussion, especially as found on pages 291, 292 and 294.

Admitting that the common and statutory law of *England* up to 4 *James I*, prevails in this State, this contract is not champertous by either of those laws.

(*a*) There are two principal statutes prevailing on this subject, 2 Edw. 1 c 25, and 28 Edw. 1 c 11, both set forth in Bacon's Abridgement, title Champerty. The statute, 3 Edw. 1 c 25, contains the words, "in the king's courts," thus expressly excluding the idea that champerty could exist elsewhere; and this has been construed to mean courts of record. 2 Institutes 208.

The amending statute, 28 Ed. 1 c 11, (which is the one universally

cited) contains this clause: "No officer nor any other for to have part of the thing in plea shall take upon himself the business that is in suit, nor upon any such covenant shall give up his right to another." Now these words have a well known and a technical meaning. "In plea" and "in suit" are unmistakable terms, and never used outside of courts of justice. There is another statute, West 2 c 29, that regulates certain officers therein named, as regards champerty and maintenance, but that has no application here, the services being performed by a private individual. 2 Institutes 484.

(*b*) Common Law—*Blackstone* defines champerty as follows: "A bargain with a plaintiff or defendant to divide the land or other matter sued for between them, if they prevail at law. * * * In one sense of the word it signifies the purchasing of a suit or right of suing; a practice so much abhorred by our law that it is one reason why a chose is not assignable at common law, because no man should purchase any pretence to sue in another's right." 4 Comm. § 135. This has been held to apply to suits in equity also. Moore 665.

*Bouvier* and *Tomlin*, in their Law Dictionaries, give this definition *verbatim.* We have carefully and critically examined all the decisions within our reach, and those cited in the United States Digest, and do not find a single application of the rule and consequences of champerty, except to cases pending or about to be instituted in Courts of justice, and we are pursuaded there are none. And *Sedgwick* v. *Stanton, supra,* seems to us to expressly decide that such contracts are legal. *Parsons,* in his work on Contracts, vol. 2, p. 261: "All those whose interests are to be affected by legislation may both legally and morally, for the protection or advancement of their interest, use all means of pursuasion that do not come too near bribery or corruption, but the promise of any personal advantage to a legislator is open to this objection, and therefore void." No rule is better settled than that illegality is never presumed, but must affirmatively appear. Nothing whatever of this kind appears upon the face of this contract, and this Court, as against its terms, can indulge in no presumptions.

(2)   The counsel for the appellees argue:

We think a contract of the character shown by the complaint, against public policy and void, because tending to legislative and

Coquillard's Adm'r *v.* Bearss et al.

public corruption. *Mr. Coquillard,* in the prosecution of the claim may have done no act, or used any influence inconsistent with the most elevated morality, but such contracts necessarily "lead to the use of improper means and the exercise of undue influence."

This principle has been applied in a variety of cases, in which it has been held that such contracts were void.

1. A contract founded upon a promise and engagement to procure signatures and obtain a pardon from the Governor for one convicted of a criminal offence and sentenced to punishment. *Hartz* v. *Gulden,* 7 Watts 152; *McGill's Adm'r* v. *Burnett,* 7 J. J. Marsh, Ky. 640.

2. An agreement to procure a contract for work and labor from the Directors of a railroad company. *Davis* v. *Seymour,* 1 Bosworth, 88.

3. A contract for compensation to resign the position of physician in a Marine Hospital in favor of the party agreeing to make the compensation. *Eddy* v. *Capron,* 5 R. I., (1 Ames,) 394.

4. A bargain to use influence in obtaining an office connected with the collection of the revenue. *Hopkins* v. *Prescott,* 4 Com. Bench R. 518; *Gray* v. *Hook,* 4 Comstock 449.

5. An agreement to prosecute and superintend, in the capacity of agent or attorney, a private claim before the legislature. *Bryan* v. *Reynolds,* 5 Wis. R. 200.

6. A contingent compensation to secure the location of a railroad station. *Fuller* v. *Dame,* 18 Pick. 472.

7. An agreement by a person to use his influence and exertions to procure the passage of a legislative act. *Harris* v. *Roofs' Ex'rs,* 10 Barb. 489; *Mills* v. *Mills,* 36 Barb. 474; *Rose* v. *Truax,* 21 Barb. 361; *Sedgwick* v. *Staunton,* 4 Kernan, (14 N. Y.,) 289.

Many illustrations of the rule will be found given in the cases cited.

It has been held in a number of cases, that contracts for a contingent compensation for obtaining legislation are void. *Clippenger* v. *Hepbaugh,* 5 Watts & Serg. 315; *Gil* v. *Williams,* 12 Lou. Ann. R. 219; *Wood* v. *McCann,* 6 Dana, Ky., 366; *Marshall* v. *The Baltimore and Ohio Railroad Co.,* 16 How, U. S. R. 324.

In the case of *Gil* v. *Williams,* it is said: "The plaintiff in this case can not recover, not because he has resorted to bad means in order to procure the passage of laws in which he had a direct pecun-

iary interest, for of this there is no proof and no imputation, but because he has made a contingent contract, which, if enforced in this case, might open the door to a practice of corruption and to the use of sinister influences." The Supreme Court of the *United States*, in the case of *Marshall* v. *The Baltimore and Ohio Railroad Company* present in a strong light the consequences proceeding from such contracts.

"Bribes, in the shape of high contingent compensation, must necessarily lead to the use of improper means and the exercise of undue influence. Their necessary consequence is the demoralization of the agent who covenants for them; he is soon brought to believe that any means which will produce so beneficial a result to himself are "proper means;" and that a share of these profits may have the same effect of quickening the perceptions and warming the zeal of influential or "careless" members in favor of his bill. The use of such means and such agents will have the effect to subject the State Governments to the combined capital of wealthy corporations, and produce universal corruption, commencing with the representative and ending with the elector. Speculators in legislation, public and private, a compact corps of venal solicitors, vending their secret influences, will infest the capitol of the Union and of every State, till corruption shall become the normal condition of the body politic, and it will be said of us as of *Rome, omne Romae venale.*"

The case at bar is not one where there has been a mere employment to present evidence to a committee, or make an argument before a committee or a legislative body, but an agreement to proceed to *Washington* and secure congressional legislation, receiving nothing in case of defeat; but should the party be successful he is to receive for compensation one-fourth of the amount secured, and he is to bear the whole expense of the proceeding.

This contract is void for another reason, for maintenance. See Bacon's abridgment, Bouvier's edition, tit. Maintenance. Maintenance was an offence at common law, the statutes merely giving additional penalties. *Peckel* v. *Watson*, 8 Meeson & Welsby 691.

The case of *Wallis* v. *The Duke of Portland*, 3 Vesey, 494, was the application of the principle to an employment by the Duke to

present a petition to the House of Commons on behalf of the other defendant, *George Tiernay*, complaining of the return of *George Jackson, Esq.*, as a member of parliament. See also, *Harris* v. *Roof's Ex'rs*, 10 Barb. on page 493.

This contract has the additional element of a division of the thing in dispute, which brings it within the definition of Champerty. See Bacon's abridgment, tit. Champerty. Champerty was a common law offence, and the statutes merely give additional penalties.

The common law upon the subject of champerty and maintenance is part of the law of *Indiana. Scobey* v. *Ross*, 13 Ind. 117, and the cases cited in note f. 2 G. & H. 160.

The case of *Sedgwick* v. *Stanton*, 4 Kernan, 289, was a contract to procure from a board of commissioners a patent for a tract of land, and it was held valid—1. Because from the character of the services to be performed, it contemplated nothing but the furnishing of evidence, and an open argument before the board. 2. Because the law, upon the subject of champerty and maintenance, was only in force in *New York* to a limited extent.