IN THE

# SUPREME COURT

OF

# OREGON.

Argued December 9, affirmed December 22, 1914.

## HYLAND v. OREGON HASSAM PAVING CO.[*]

(144 Pac. 1160.)

**Contracts—Construction Against Party Using Terms.**

1. A party writing a contract cannot reasonably contend that he did not intend to do all that the contract by its terms obliged him to do.

**Contracts—Validity—Lobbying.**

2. Any person interested in any proposed legislation before any legislative body, including the common council or other law-making body of a municipal corporation, may legally employ an agent or an attorney to collect facts relating thereto, and to prepare a bill, and to explain the desired measure to the legislative body or any committee thereof fairly and openly, and have it introduced, and a contract to pay for such services, so rendered, is not a violation of law or of public policy.

**Contracts—Validity—Lobbying Contract.**

3. A contract whereby a paving company agreed to pay plaintiff 3 per cent of the contract price on all contracts for street improvement work entered into between it and a city, to be earned when the contracts should have been duly signed by the company and the city, and providing that plaintiff should "at all times do everything in his power" to further the business of the company, under which plaintiff was to circulate petitions among property owners asking that streets be paved with the company's product, and obtain signatures of 20 per cent of the property owners, to present such petitions to the city council, to answer and fight remonstrances, and, by bringing property owners before the street committee and the council, to

---

*The question of the validity of a contract for services to procure legislation is discussed in notes in 30 L. R. A. 737 and 4 L. R. A. (N. S.) 213.                                        REPORTER.

procure the passage of ordinances and resolutions authorizing the paving of streets, and assessing the expense on the adjacent lots, in effect a selling or promoting proposition, in view of the fact that the compensation was contingent, and was broad enough to cover services of any kind, secret or open, honest or dishonest, and the exercise of personal and private influence upon the city council, and of the fact that such compensation was probably included in the company's contract price, was invalid, as against public policy.

From Multnomah: JAMES W. HAMILTON, Judge.

This is an action by George M. Hyland against the Oregon Hassam Paving Company, a corporation, by reason of a contract of employment entered into between plaintiff and defendant. There was an involuntary nonsuit allowed and plaintiff appeals. The facts are stated in the opinion of the court.    AFFIRMED.

For appellant there was a brief over the name of *Messrs. Stapleton & Sleight,* with an oral argument by *Mr. R. Sleight.*

For respondent there was a brief over the names of *Mr. Omar C. Spencer, Messrs. Carey & Kerr* and *Mr. Charles A. Hart,* with an oral argument by *Mr. Spencer.*

Department 1. MR. JUSTICE RAMSEY delivered the opinion of the court.

The defendant is a corporation and engaged in the business of paving streets with a certain patented process. On January 10, 1909, the defendant and the plaintiff entered into a written contract by which the defendant employed the plaintiff to work for it for a stated length of time for a compensation stated in the said contract. A part of said contract is as follows:

"Said party of the first part *agrees to pay said party of the second part,* for and in consideration of the services rendered by said party of the second part,

as hereinafter specified, *the sum of 3 per cent of the contract price on all contracts for street improvement work entered into by and between said party of the first part and the City of Portland,* or any other city, firm, corporation or individual during the life of this agreement. The said contract price shall be the estimated amount of the total cost of such improvement according to the estimate supplied in plans and specifications therefor. *The said remuneration shall be deemed to be earned by said party of the second part when the contract shall have been duly signed by said party of the first part and the City of Portland,* or other city, firm, corporation or individual, and the amount due said party of the second part under this agreement shall become due and payable thereafter on demand. It is further understood and agreed that the said party of the second part shall have the right to draw against an account, which shall be opened between him and the said party of the first part, the sum of two hundred fifty ($250.00) dollars for each and every calendar month of any and all years during the life of this contract, and that said sum of two hundred fifty ($250.00) dollars shall be charged against the account of said party of the second part, and shall be deducted from the sum or sums which are at any time due, or shall become due to the said party of the second part from said party of the first part.

"It is further understood and agreed that the party of the first part herein guarantees to the party of the second part that his annual compensation under the terms of this agreement shall be not less than three thousand ($3,000.00) dollars during any one year of this contract, and the said party of the first part agrees in any event to pay to the party of the second part three thousand ($3,000.00) dollars each and every year during the period of his employment, regardless of whether or not the commissions earned under the conditions of this agreement by the said party of the second part shall equal said sum. It being understood that commissions earned on business taken during any one year of this contract shall not be carried forward

to make up any part of compensation for a succeeding year, and that all commissions are to be credited to the year in which the contract was taken, and not otherwise.

"It is further agreed by the party of the first part that, in addition to the compensation of the party of the second part hereinbefore provided, said party of the first part shall pay unto the said party of the second part the sum of fifty (50) dollars a month for each and every month during the term of this agreement. Said sum to be an item of expense by said party of the first part, and in no way become a part of the compensation earned by said party of the second part under the other terms of this agreement.

"And the said party of the second part *agrees to devote his time, and the whole thereof, and to give his best attention to the affairs and business of the said party of the first part. It is understood that said party of the second part shall at all times do everything in his power to accomplish the success of and aid the business of the said party of the first part;* and it is expressly understood and agreed that the said party of the second part shall not at any time throughout the life of this agreement enter into any other employment in the interests of any other enterprise or parties, and shall devote his time and attention to the affairs of the said party of the first part."

When the demand that is the basis of this action accrued, the said contract was in force and the plaintiff's rights are measured by said contract. The third, fourth and fifth paragraphs of the complaint are as follows:

"That the plaintiff performed services for the defendant under and in pursuance of said contract in securing street improvement work for the defendant from the City of Portland. That as a part of said services *the plaintiff procured for the defendant from the City of Portland a contract for the improvement of* a portion of Macadam Street, *and that the defendant and*

*the City of Portland entered into a contract for such improvement work on the 29th day of September, 1910,* by the terms of which and the plans and specifications thereunder, defendant agreed with the City of Portland that it would pave and improve said portion of Macadam Street, and the City of Portland agreed to pay the defendant therefor the sum of $108,519.96. *That under the terms of said contract the plaintiff earned the sum of $3,255.59 as his commission and compensation for procuring the said contract,* and that the same became due and payable on demand after the signing of said contract as aforesaid.

"That the plaintiff has duly performed all the conditions of said contract on his part to be performed.

"That on or about the 1st day of October, 1910, plaintiff demanded of said defendant payment of said sum earned under said contract, but no part thereof has been paid."

The defendant denies parts of the complaint, and alleges, *inter alia,* that said contract for the paving of Macadam Street stated in the complaint was void, and that the plaintiff, on the 24th day of February, 1911, executed and filed with the City of Portland, for and on behalf of the defendant, a written consent to the abandonment of all rights under said contract, and that the plaintiff agreed not to claim any commission on said contract. The plaintiff admits that the said contract was rescinded with his consent, and that the defendant did not improve or pave any part of said street. The defendant set up, *inter alia,* the following separate defense:

"Defendant, for a second, further and separate answer and defense to the first alleged cause of action contained in the complaint herein, alleges as follows: That the said pretended contract set out in the complaint as Exhibit 'A' is and was void and against public policy in this: That by the terms of said contract plaintiff undertook to do everything in its power to

accomplish the securing of paving contracts from the city council and the executive board of the City of Portland. That the said city council and said executive board were and are public bodies, and plaintiff undertook to use and did use his personal influence, friendship and acquaintance to influence the deliberations and determinations of said bodies and the individual members thereof.''

The reply admits portions of the answer, but denies other portions thereof, and sets up new matter. The plaintiff and one other witness testified in the case, and, the plaintiff having rested, the court, on motion of the defendant, granted a judgment of nonsuit, holding that the plaintiff's claim for commissions and the contract on which it is based are void as being contrary to public policy, etc. The plaintiff appeals.

The question for decision is: Are the plaintiff's claim for commissions and said contract void, as being contrary to public policy? The complaint states that the plaintiff's cause of action is for procuring for the defendant, from the City of Portland, a contract for the improvement of a portion of said Macadam Street. By this contract the defendant was to improve and pave a portion of said street, and said city was to pay the defendant therefor $108,519.96. As stated *supra,* this contract was rescinded with the consent of the plaintiff, and the defendant received nothing from the city thereon. It is to be noted that the plaintiff demands from the defendant the said $3,255.59 *for obtaining from said city said contract.* By the first paragraph of said contract the defendant agrees to pay the plaintiff 3 per cent of the contract price on all contracts for street improvement work entered into by and between the defendant and the City of Portland during the life of said contract (five years), and said contract provides *that said remuneration shall be*

*deemed earned by said party of the second part* (the plaintiff) *when the contract shall have been duly signed by the defendant and the city.*   The following part of said contract has a material bearing on the point urged by the defendant and sustained by the trial court:

"And the said party of the second part (the plaintiff) agrees to devote his time and the whole thereof, and to give his best attention, to the affairs and business of said party of the first part (the defendant). *It is understood that said party of the second part* (the plaintiff) *shall at all times do everything in his power to accomplish the success of and aid the business of the party of the first part*" (the defendant).

1–3. It will be noted that the contract provides *that the plaintiff shall at all times do everything in his power to accomplish the success of the business of the defendant.*   The plaintiff says that *he* wrote said contract, and hence he cannot reasonably contend that *he* did not intend to do all that the contract by its terms obliged him to do.   His duty was to obtain from the city paving contracts for the defendant.   In order to obtain such contract, petitions had to be circulated among the property owners adjacent to the streets, asking that the streets be paved, and these petitions, it seems, were required to be signed by at least 20 per cent of the property owners.   The plaintiff had charge of obtaining these signatures, and in order to obtain them it was necessary for him to convince at least 20 per cent of the property owners that the streets should be paved with the Hassam pavement.   When the proper petitions were obtained, they were presented to the city council.   The plaintiff had charge of that, too, and had to do it, or see that it was done.   If a remonstrance was presented against the proposed improvement, it was his duty to fight that also.   The fol-

lowing extracts from the plaintiff's evidence show some of the work done by him in obtaining contracts:

"When a remonstrance was filed by certain property holders on the street which was having the improvement, they did not want our particular street, or they did not want any, and so on, I copied from the city records a list of those remonstrances and would get some of my help—whoever was working for me, I always paid my own help—and we went out and explained to the people as best we could that our street was superior, or that it was cheaper, or, if they were opposed to paving altogether, why the street should be paved; that is, as a matter of civic pride and improvement of their property. It was salesmanship in that respect. When we were getting these signers, we did not go to all of them, because it was a matter of expense to me, and time, and many men were working, and we could not see them. We were around all the time, but it was impossible to see all of them, and we did not know who objected until the remonstrances came in, and then we would go back and get them satisfied, if possible.

"I can only testify to the part I had and those things that I was concerned in with my company. For instance, I took in a petition that represented thirty (30) per cent of the property owners on the presumption they were getting hard surface petitions as they had previously done on the twenty (20) per cent basis, and I presumed they would grant mine, and when did not and were discontinued and sent back, and the company complained to me about the matter, I immediately went down to the property owners on the street and solicited them to go to the city hall and assist me in showing to the council this was the street they wanted. This was the one they preferred. And sometimes I would get as many as a dozen, twenty or thirty, and sometimes *in some cases a hundred,* to go up with me and fight for the pavement I represented. That was my method. I took the property owners to the street committee *and sometimes before the council itself.* I did not interview a member of the com-

mittee *individually* or a member of the council *individually.*

"Q. Did any of your property owners?

"A. I am not testifying to what they did."

The foregoing is a fair example of the plaintiff's activity in obtaining contracts. Contracts could not be obtained without petitions to the council, and the passage of ordinances and resolutions by that body. The plaintiff was charged with the duty of getting all these things done, and he represented the defendant therein.

Mr. E. H. Bauer was a director and treasurer of the defendant while the plaintiff was working for it under said contract. He was a witness for the plaintiff, and stated the plaintiff's duties under said contract as follows:

"He was to secure the contracts and, as I understood it, solicit petitions, handle the promotion end of it up to the time when the company should sign the contract. I understood that Mr. Hyland's work, soliciting petitions, and, in general, watching everything that might come up, as Mr. Hyland explained it, in furthering the contracts up to the time of signing—that we could sign the contracts with the city."

According to the complaint, the contract, and the evidence given in the plaintiff's behalf, it was the duty of the plaintiff to devote all of his time as a "promoter" to obtaining paving contracts for the defendant and he had charge of all the "promoting" business from the preparing and the circulating of petitions for paving until the contracts had been awarded to the defendant by the city and they were ready to be signed by the city and the defendant. He appeared before committees and the council, and, with all of his power, urged the awarding of contracts to his employer. The contract provides that the plaintiff "shall at all times

*do everything in his power to accomplish the success* of and aid *the business* of'' *the defendant.* According to the contract, there is no limit upon *what he is obliged to do.* He is required to do his utmost to obtain contracts for paving streets for the defendant. He shows, by his evidence, that he circulated petitions to have streets paved, and importuned lot owners to sign them. He appeared before the council and before the committees thereof, and presented these petitions, and urged favorable consideration of them, and pressed these matters for the defendant, in order to obtain paving contracts and earn his compensation of 3 per cent on the contract price of the work obtained by him. He was to have 3 per cent of the contract price of all contracts that his company obtained in Portland or elsewhere in the state. However, the company guaranteed him at least $3,000 per annum, and it furnished him, also, $50 per month additional for ''expenses.'' His compensation above $3,000 per annum was contingent on his obtaining contracts for paving that aggregated more than $100,000 per annum. The evidence of Bauer shows that he obtained plenty of business for the company. The plaintiff does not claim that he had not been well paid, outside of the matters stated in the complaint.

The trial court held that the contract sued on is contrary to public policy and void. There is an irreconcilable conflict in the decisions of the courts of the different states on this point. The plaintiff's right, in this case, to the 3 per cent commission was contingent on his success in obtaining contracts from the city. In order to obtain them, it was necessary, as stated *supra,* to procure the passage by the city council of ordinances and resolutions authorizing the paving of the streets and assessing the expense thereof on the

adjacent lots. The plaintiff was to be paid 3 per cent of the contract price of the work authorized by each contract obtained, and this was due him, under the contract, as soon as each contract was signed. The employment of the plaintiff as a "promoter" under this contract very likely added 3 per cent to the cost of the pavement, as what he was to be paid was probably reckoned as a part of the expense, when the amount to be charged for paving was determined by the company.

Any person interested in any proposed legislation before any legislative body may legally employ an agent or an attorney to collect facts relating thereto and to prepare a bill for the contemplated legislation, and such agent or attorney may explain the desired measure to the legislative body or any committee thereof fairly and openly, and have it introduced, and a contract to pay for such services, so rendered, violates no principle of law or of public policy: 15 Am. & Eng. Ency. Law (2 ed.), p. 970. But public policy requires that legislators or councilmen act solely from considerations of public duty and with an eye single to the public interests, and the courts uniformly hold to be illegal contracts for services that involve the use of secret means or the exercise of sinister or personal influences upon lawmakers to secure the passage or the defeat of proposed laws or ordinances. This principle applies to common councils or other law-making bodies of municipal corporations to the same extent that it does to Congress or the legislature of a state: 15 Am. & Eng. Ency. Law (2 ed.), p. 969. In the case of *Sweeney* v. *McLeod,* 15 Or. 330, 339 (15 Pac. 275, 279), the plaintiff sought to recover for services rendered at the legislature to prevent by "legitimate importunity" the passage of a law prohibiting the taking of salmon

by a fish-wheel.   The judgment of the court below was reversed; the court saying, *inter alia:*

"Such contracts as the one sued on are always closely and rigidly scrutinized by the courts when sought to be enforced.   Nothing wrong may have been intended in this particular case, nor was it necessary. If the terms of the contract required any services to be rendered, or if the party employed in furtherance of the general purposes of his employment rendered or designed to render any services, either to cause or to prevent any legislative action otherwise than by publicly presenting the subject before the legislature or some of its committees, such contract cannot be enforced in this state."

In *Crichfield* v. *Bermudez Asphalt Paving Co.,* 174 Ill. 466 (51 N. E. 552, 42 L. R. A. 347), the court had under consideration a contract substantially the same as involved in this case.   The Supreme Court of Illinois held that the contract was against public policy and void, using this language:

"Upon the face of the contract the meaning of the expression 'to solicit and promote the asphalt paving business in the City of Chicago' is to solicit, by the exercise of influence and other means, the passage of ordinances and the letting of contracts by the members of the common council of the City of Chicago. * * There are some salient features of this agreement which stamp it as being against public policy.   A special assessment for public improvement under our statute is a species of taxation, and is authorized only as an exercise of the taxing power.   A special assessment should not be levied, except for the purpose of making a needed public improvement.   The property owner should not be assessed, and his property made to bear the burden of taxation except to secure the benefits of a needed public improvement.   The idea of making a contract to promote the levying of a public assessment, not for the purpose of securing to the public a needed improvement, *but for the purpose of en-*

*abling a paving company to get a job, is not only against the public interests, but is abhorrent to all proper ideas of justice and honor.* Property owners should not be assessed for the purpose of paying moneys into the pockets of paving contractors, and any contract by which parties agree to obtain ordinances by solicitation and by the exercise of influence upon public officials, and with a view of obtaining contracts which result in the end from the passage of such ordinances, is against public policy, and will not be enforced by the courts.''

In *Wilbur* v. *New York Electric Construction Co.,* 12 N. Y. Supp. 456, the contract under discussion was one wherein the plaintiff agreed to do certain work in soliciting, advocating and procuring from the City of Utica a three-year contract for the defendant for lighting said city, and for a franchise to be granted to the defendant permitting it to erect its poles and appliances in the streets. Plaintiff was not a lawyer, but described himself as being familiar with the electric light business. The court held the contract void, saying, *inter alia:*

''I think this contract is void. * * It has long been settled that a contract to exert personal influence to induce a public officer or a member of a legislative body to do any official act is illegal and void, and this principle has been applied to all the departments of government, judicial, executive and legislative, and is placed on the broad principle that all contracts leading to secret, improper and corrupt tampering with official action are void.''

In *Powers* v. *Skinner,* 34 Vt. 274 (80 Am. Dec. 677), the contract relied upon was one wherein plaintiff agreed to perform services before the legislature in aid of an application for a charter for a bank. It was found that the contract was against public policy and

void, the court laying down the following test to be applied in such cases:

"The principle of these decisions has no respect to the equities between the parties, but is controlled solely by the tendency of the contract; and it matters not that nothing improper was done, or was expected to be done under it."

In *Providence Tool Co.* v. *Norris*, 2 Wall. 45 (17 L. Ed. 868), Norris entered into an agreement by the terms of which he agreed to obtain, cause or procure from the government of the United States contracts for the sale of muskets. The compensation to be paid Norris was *contingent* upon his success. Mr. Justice Field, delivering the opinion of the court, held the contract was against public policy and void, using the following language:

"The question, then, is this: Can an agreement for compensation to procure a contract from the government to furnish its supplies be enforced by the courts? We have no hesitation in answering the question in the negative. All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the government. No other consideration can lawfully enter into the transaction, so far as the government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation, and personal influence, as elements in the procurement of contracts, and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds."

In *Mills* v. *Mills,* 40 N. Y. 543, 546 (100 Am. Dec. 535), the contract under discussion provided that the plaintiff should convey certain real property to the defendant as soon as a bill then pending before the Senate of the State of New York should become a law. The defendant promised that he would give all the aid in his power and spend such reasonable time as might be necessary and generally use his utmost influence and exertions to procure the passage of the law. The court held that the agreement to convey the property was against public policy and void, saying:

"It is not suggested that the plaintiff was a professional man, whose calling it was to address legislative committees. It is not suggested that he had any claim of right, which he proposed to advocate, and which right or debt he proposed to transfer to the defendant. He had simply asked of the legislature the privilege or favor to be granted to him of building and operating a railroad upon certain streets of the City of Brooklyn. This privilege may be assumed to be of pecuniary value. To procure the passage of such a law for the benefit of the defendant, he undertook to use his utmost influence and exertions. This contract is void as against public policy. It is a contract leading to secret, improper and corrupt tampering with legislative action."

See, also, in this connection *Flynn* v. *Bank of Mineral Wells,* 53 Tex. Civ. App. 481 (118 S. W. 848).

In 2 Elliott, Contracts, Section 1051, the author says:

"The numerical weight of authority supports the doctrine that all contracts for procuring legislation are void, where the compensation to be received is contingent on the success of the promisee in obtaining either the passage or defeat of a proposed act, *even though the contract did not contemplate the rendition of improper services, and though no improper services were in fact rendered. A contingent fee is a strong and di-*

*rect incentive to the exertion of not merely personal, but sinister, influence upon legislation.* This rule is not, however, universal,'' etc.

1 Page, Contracts, Section 414, says, *inter alia:*

''So a contract whereby A employs B to act openly and legally in securing a reduction of an excessive claim against A for taxes is valid. But if the agent is to use his personal influence with public officials whose favorable action he seeks to obtain, and is to resort to private solicitation therefor, the contract of employment is illegal, even if the fact of employment as lobbying agent is not a secret, and if no improper influence is to be used. Thus the employment of an attorney to render services which in part consist of personal solicitation of legislators is illegal. *The invalidity is specially clear when the compensation of the agent is in part or in whole dependent on his success in obtaining the passage of an ordinance.*''

2 Elliott, Contracts, Section 1042, says:

''Contracts 'to give all the aid in his power, to spend such reasonable time as may be necessary, and generally to use his utmost influence and exertions to procure the passage into a law' of a specific bill, to 'use his influence, efforts and labor in procuring the passage of a law by the said legislature,' or to procure legislation upon a matter of public interest in regard to which neither of the parties had any claim against the United States, have been declared void. It has been said that 'if the terms of the contract be broad enough to cover services of any kind, *whether secret or open, honest or dishonest, the law pronounces a ban upon the paper itself.*' *Nor will honest services substantially performed sanctify an unlawful contract.*''

In *Weed* v. *Black,* 9 D. C. (2 MacArthur) 268, 274, 275 (29 Am. Rep. 618), the Supreme Court of the District of Columbia says:

"Honest contracts, however, whose character appears upon their face, are unaffected by the rule. *If the terms of the contract be broad enough to cover services of any kind, whether secret or open, honest or dishonest, the law pronounces a ban upon the paper itself. Nor will honest services substantially performed sanctify an unlawful contract.* But contracts which provide for compensation in consideration of particular services to be rendered, such as the collection of evidence, the preparation of papers, or the delivery of arguments in support of claims, are legitimate everywhere."

The fact that the compensation to be paid is wholly or in part *contingent* upon the payee's success in obtaining the passage of the ordinance or law is an important circumstance to be considered in determining the validity or the invalidity of the contract under consideration, and a majority of the adjudications seem to hold such a contract to be invalid: See 2 Elliott, Contracts, § 1051; *Coquillard's Admr.* v. *Bearss,* 21 Ind. 479 (83 Am. Dec. 362); *Marshall* v. *Baltimore & O. R. Co.,* 16 How. (57 U. S.) 314, 335 (14 L. Ed. 953); *Gil* v. *Williams & Davis,* 12 La. Ann. 219 (68 Am. Dec. 767); *Wood* v. *McCann,* 6 Dana (Ky.), 366. Justice GRIER, in *Marshall* v. *Baltimore & Ohio R. R. Co.,* 16 How. (57 U. S.) 314, 335 (14 L. Ed. 953), after examining the cases upon this point, comes to the following conclusion:

"The sum of these cases is: *That all contracts for a contingent compensation for obtaining legislation,* or to use personal or any secret or sinister influence on legislators, *is void by the policy of the law.*"

The following clause of the contract between the plaintiff and the defendant, as we view it, is about as strong as it could be made, and it was written by the plaintiff himself:

*"It is understood* that *said party of the second part* (the plaintiff) *shall* at all times *do everything in his power to accomplish the success* of and aid *the business of the said party of the first part"* (the defendant).

No one could do or be required to do more than said contract required the plaintiff to do to accomplish the success of the business of the defendant. The business that the plaintiff was employed to do was to obtain . paving contracts from the city, and this could not be accomplished without the passage of ordinances and resolutions by the city. The effect and import of the contract are that the *plaintiff shall* at all times do everything in his power to obtain the passage of all necessary resolutions and ordinances and to obtain contracts from the city. We think that this contract comes within the meaning of the court in *Weed* v. *Black,* 9 D. C. (2 MacArthur) 268, 274 (29 Am. Rep. 618), where the court says:

"If the terms of the contract be broad enough to *cover services of any kind, whether secret or open, honest or dishonest, the law pronounces a ban upon the paper itself.* Nor will honest services substantially performed sanctify an unlawful contract."

The terms of this contract are broad enough "to cover services of any kind, secret or open, honest or dishonest." They are broad enough to cover secret interviews with councilmen, and the exercise of personal . and private influence with the councilmen and other city officials. The terms of the contract are broad enough to cover any act, whether honest or dishonest, legal or illegal that might be resorted to "to accomplish the success" in obtaining contracts. He promised to "do everything in his power" to succeed. Taking into consideration the fact that the plaintiff's compensation was contingent on his success in obtaining from

the city paving contracts, and his promise to do everything in his power at all times to obtain these contracts from the public, we conclude that said contract is contrary to public policy, and that the court below did not err in granting the judgment of nonsuit. This conclusion is not in conflict with the decision in *Obenchain* v. *Ransome-Crummey Co.*, 69 Or. 547 (138 Pac. 1078).

The judgment of the court below is affirmed.

AFFIRMED.

MR. CHIEF JUSTICE MCBRIDE and MR. JUSTICE MOORE concur.

MR. JUSTICE BURNETT dissents.