HARDESTY *v.* DODGE MANUFACTURING COMPANY.

[No. 12,369. Filed January 6, 1927. Rehearing denied June 10, 1927. Transfer denied April 19, 1929.]

*Drain & Drain, Shively & Gilmer* and *Matson, Carter, Ross & McCord,* for appellant.

*Zane, Morse & Norman* and *Parker, Crabill, Crumpacker & May,* for appellee.

NICHOLS, J.—Action by appellant against appellee upon a contract by the terms of which appellee engaged appellant to represent it before the government of the United States and its various departments, and by the further terms of which appellee promised and agreed to pay appellant $150 per month and a commission of three per cent on all contracts with the government, based on the gross amount of same. The complaint charged that during the term of this agreement, contracts were awarded by the United States government and its various agencies to appellee in the gross amount of $3,503,285,

and that appellee paid appellant on account thereof $45,233.08, leaving a balance due of $64,965.47 and interest.

Appellee, by answer, denied the validity of the contract with appellant, answering also that, even if the contract were valid, appellant could recover but three per cent of $1,193,742.50, the amount received under the contract with the government, plus $5,100, retained for thirty-four months, making a total due appellant of $40,912.27. As appellant had already received $45,223.08 appellee contends that it had overpaid appellant more than $4,000. At the trial, after the close of the evidence, the court instructed the jury to return a verdict for appellee, on which judgment was rendered. The error assigned is the action of the court in overruling appellant's motion for a new trial. As stated by appellant, the questions presented are: (1) Is the contract sued on, as a matter of law, void as against public policy? If so, the court did not err in instructing the jury to return a verdict for appellant; (2) if not, were the contracts awarded by the government, contracts within the meaning of the engagement between appellant and appellee; and (3) if they were, is appellee entitled to a recovery based upon three per cent of the entire contract price, or is he limited to three per cent on the price of the delivered products, or three per cent of the total amount received from the government by appellee, including compensation for suspension?

Prior to the entry of the United States into the World War, appellant, Hardesty, had been for twelve years in the service of the Engineering Corps and the Quartermaster Department of the United States Army, and thereafter and for eighteen years prior to the war, he had been a consulting engineer employing a large office force in that business. He had lived in Washington for these thirty years and had formed the acquaintance of many

of the purchasing officers and engineers of the army and navy and other governmental departments, and, at the time here involved, was engaged in the business of representing manufacturers in the business of obtaining government contracts.

Appellee was an Indiana corporation, with its plant at Mishawaka, Indiana. Its regular business had been interfered with by the war and it was unable to get access to the purchasing officers of the government in Washington so as to obtain some of the contracts for war supplies to take the place of its regular business. It had a consulting engineer in Washington, but he could not get the business. This engineer introduced the president of appellee to appellant. Appellee considered it necessary and desirable to be represented in Washington, and considered whether it would open an office and place its own personnel in charge or employ appellant with his office and assistants in lieu thereof. It decided finally to employ appellant to represent it in its name before the government and its various departments in the matter of its business with the government. After some negotiations, appellant and appellee entered into a contract by which appellee employed appellant to perform this service and agreed to pay him a retainer of $150 per month and "a commission of three percent on all contracts with the government, based on the gross amount of same." Appellant represented appellee from the date of the contract, July 28, 1917, to the latter part of May, 1920, during which time six contracts were awarded by the government to the appellee, aggregating $3,503,285. Appellee entered into the performance of these contracts, fully performed two of them, and, in part, performed all the others, receiving for products manufactured and delivered $1,193,742.50. However, before the completion of performance, the government on account of termination of the war, suspended opera-

tions under the uncompleted contracts, and appellee and the government entered into a settlement agreement by the terms of which the United States government awarded $771,845.30 in compensation by way of reimbursement to appellee. Of the uncompleted contracts, three contained provisions for their cancellation, and the fourth was not reduced to writing, and no deliveries were made thereunder. Its aggregate amount would have been $170,973, and the government paid appellee to reimburse it for its expenditures under this contract $12,414.72.

It is undisputed that at the time of the contract involved, which was a letter in form, accepted by appellee, there were no contracts between appellee and the government, and that such contract was entered into in contemplation of the negotiation of contracts between appellee and the government. That was the business in which appellee wished to engage, and, by the provisions of the contract, it was appellant's "office and object to represent the interests of the Dodge Manufacturing Company in all the departments of the government, prosecuting your business to advantage, . . ." and, after providing for three per cent commission, it was further provided that in the event the business would justify, appellee was to fix the commission at a higher rate. Under this contract, appellant secured for appellee the six contracts mentioned above, thereby prosecuting appellee's business to advantage. Had there been no contracts, there would, of course, have been no commissions. That such a contract was for a contingent compensation hardly needs to be stated, and it is clear that it falls within the inhibition of decisions in the Supreme Court of the United States, and of the Supreme Court of Indiana. A leading federal case is that of *Tool Company* v. *Norris* (1864), 2 Wall. (U. S.) 45, 17 L. Ed. 868, which involved compensation to Norris to the ex-

tent of a contract to be made for muskets between the company and the government. The court, reversing a judgment on a verdict for the plaintiff, said: "Agreements for compensation contingent upon success suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception. There is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. The introduction of elements to control the action of both is the direct and inevitable result of all such arrangements."

Speaking with reference to the contract there in suit, the court said: "The question, then, is this: Can an agreement for compensation to procure a contract from the government to furnish its supplies be enforced by the courts? We have no hesitation in answering the question in the negative. All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the government. No other consideration can lawfully enter into the transaction, so far as the government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements like the one under consideration have this tendency, is manifest. They tend to introduce personal solicitation and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds."

And again, the court said: "Other agreements of an

analogous character might be mentioned, which the courts, for the same or similar reasons, refuse to uphold. It is unnecessary to state them particularly; it is sufficient to observe generally that all agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements and it closes the door to temptation, by refusing them recognition in any of the courts of the country."

This case has been cited with approval in *Meguire* v. *Corwine* (1879), 101 U. S. 108, on 111, 25 L. Ed. 899; *Oscanyan* v. *Winchester Arms Co.* (1880), 103 U. S. 261, on 273, 26 L. Ed. 539; *Woodstock Iron Co.* v. *Extension Co.* (1889), 129 U. S. 643, on 662, 9 Sup. Ct. 402, 32 L. Ed. 819; *McMullen* v. *Hoffman* (1899), 174 U. S. 639, on 648, 19 Sup. Ct. 839; *Sage* v. *Hampe* (1914), 235 U. S. 99, on 105, 35 Sup. Ct. 94, 59 L. Ed. 147; *Crocker* v. *United States* (1916), 240 U. S. 74, on 79, 36 Sup. Ct. 245, 60 L. Ed. 533.

The Norris case is also cited with approval in *Elkhart County Lodge* v. *Crary* (1884), 98 Ind. 238, 49 Am. Rep. 746. That case involved compensation to the appellants for the use of their room for post-office purposes for a period of ten years, provided they would yield their room to the government for a nominal rent and would use proper persuasion to secure the location of the post office in their room. Notes sued on were executed pursuant to the agreement, which was contingent upon the favorable action of the government in locating the post office in appellant's room. It was there held that, the agreement being against public policy, there was no consideration for the notes, and there could be no re-

covery, the court saying: "While contracts for the payment of fixed fees for professional services are valid, yet, when the fees are made contingent upon success in obtaining the desired legislation, the contract sought or the office asked of the government, the contract becomes so tainted with illegality as to render it void. 'High contingent compensation,' said Justice Grier, 'must necessarily lead to the use of improper means and exercise of undue influence' (*Marshall* v. *Baltimore, etc., R. Co.,* 16 How. 314, 335, 14 L. Ed. 953) and the decisions give approval to his discussion of the question of the legality of such contracts, and concur in the conclusion that all such contracts are against sound public policy (citing cases).

"The contract before us has two infirmities, one of an agreement for the use of personal influence, and another of an agreement for compensation dependent upon the contingency of success. That we are correct in saying that the agreement is dependent upon a contingency, is shown by the fact that the consideration became payable only in the event that the post office was located and maintained in appellant's building."

Appellant contends that his engagement was to represent appellee in a professional capacity before the government for a compensation dependent on the volume of business between appellee and the government. But the compensation was necessarily contingent upon contracts being secured for appellee, and the above quotation states the principle under which appellant cannot recover even for professional services. Speaking of professional services, the court in *Trist* v. *Child* (1874), 21 Wall. (U. S.) 441, 22 L. Ed. 623, says: "We have said that for professional services in this connection, a just compensation may be recovered, but where they are blended and confused with those which are forbidden, the whole is a unit and indivisible. That which is bad

destroys that which is good,. and they perish together. Services of the latter character, gratuitously rendered, are not unlawful. The absence of motive to wrong is the foundation of the sanction. The tendency to mischief, if not wanting, is greatly lessened. The taint lies in the stipulation for pay. Where that exists, it affects fatally, in all its parts, the entire body of the contract."

The principle of the Norris case was early announced in Indiana. See *Coquillard's Admr.* v. *Bearss* (1863), 21 Ind. 479, 83 Am. Dec. 362. Other cases announcing the same principle are: *State* v. *Johnson, Admr.* (1875), 52 Ind. 197; *Maguire* v. *Smock* (1873), 42 Ind. 1, 13 Am. Rep. 353.

The case of *Hogston* v. *Bell* (1916), 185 Ind. 536, 112 N. E. 883, relied on by appellant, when carefully read, is not helpful to him, for, though the court decided that the contract involved did not contemplate compensation for securing legislative action, and that it did not contemplate compensation contingent upon securing governmental action, the court announced the principle here involved as follows: "There can be no doubt that the law is well settled in this and in other jurisdictions that, while contracts for the payment of fixed fees for legitimate professional services rendered before legislative bodies are valid, yet, when the fees are made contingent on success in obtaining the desired results, the contract becomes so tainted with illegality as to render it void (citing cases). This rule is based on the ground that when compensation is directly or indirectly contingent on success before the legislative body, it must. necessarily encourage and lead to the use of improper means and the exercise of undue influence."

It is apparent from these authorities that, under the law as interpreted by the Supreme Court of United States, and by the Supreme Court of Indiana, appellant's con-

tract was invalid, and that there can be no recovery thereunder. We do not need to consider authorities cited from other states, as the above authorities are controlling.

Having determined that appellant's contract was invalid, we do not need to consider the second and third questions presented as to the amount of compensation to which appellant would have been entitled had the contract been valid.

After hearing the evidence establishing the undisputed facts as above set out, the court did not err in instructing the jury to return a verdict for appellee.

The judgment is affirmed.