James C. DOUGHERTY, Trustee under the Will of Hugh K. Dougherty, Deceased, and Lee C. Bettinger, Plaintiffs,

v.

ALEUTIAN HOMES, INC., a corporation, Ray B. Woodbury, individually and Ray B. Woodbury and Lucille B. Woodbury, co-partners doing business under the name of Columbia Supply Company, Defendants,

and

United States of America and M. G. Gebhart, Receiver, Intervenors.

Civ. No. 8381.

United States District Court
D. Oregon.

June 20, 1962.

---

Stuart W. Hill, Portland, Or., for J. C. Dougherty, plaintiff.

Paul R. Meyer, Portland, Or., for Ray B. Woodbury, defendant.

Roger Rose, Asst. U. S. Atty., Portland, Or., for United States.

Norman J. Weiner, Portland, Or., for Aleutian Homes, Inc., defendant.

Donald McEwen, Portland, Or., for receiver of Aleutian Homes.

KILKENNY, District Judge.

Plaintiffs prosecute this action on certain contracts with defendants growing out of an urgent need for housing for Naval personnel at the Naval Base in Kodiak, Alaska. During most of the period in question plaintiff Bettinger was Mayor of the City of Kodiak. Defendants challenge the validity of said contracts on the grounds that the same required the use by Bettinger, as Mayor of said City, of his official position and influence and, in addition thereto, defendants join with intervenors in claiming that the provisions for compensation mentioned in the contracts are prohibited by the very statutes which created the funds and the regulations promulgated thereunder. The issues as to the validity of said contracts have been segregated from the remainder of the issues in litigation and those are the only issues before the court at this time. Governmental agencies involved in the housing program were:

(1) Federal Housing Administration, (FHA);

(2) Housing & Home Finance Administrator, (HHFA);

(3) Federal National Mortgage Association, (FNMA);

(4) Community Facilities Administration, (CFA);

(5) Alaska Housing Authority, (AFA), an agency of the Territory of Alaska concerned with housing problems in that Territory; and

(6) City of Kodiak, acting principally through its Mayor, the plaintiff Lee C. Bettinger.

Commencing in 1949 the possibility of securing additional housing for Naval and civilian personnel connected with the Kodiak Naval Base in Alaska was discussed among Navy officials, officials of the Alaska Housing Authority, officials of the City of Kodiak and officials of FHA.

During 1950–51, arrangements were made to secure, as a site for this project, certain land belonging to the federal government under the control of the Bureau of Land Management of the Department of the Interior. Arrangements were made to transfer this land to the Alaska Housing Authority for reconveyance to the City of Kodiak for use for a project to be built by a *sponsor selected by the City of Kodiak*. Subsequently, in accordance with law, the Alaska Housing Authority conveyed the land directly to the approved sponsor. During 1951, the City of Kodiak received a commitment from the Alaska Public Works program for money to construct the sewer and water facilities in connection with the proposed project.

In those years considerable surveying and engineering of the site was carried on in behalf of the City of Kodiak and a Raymond Lewis of Los Angeles who was a proposed sponsor for the project. In late 1951, Mr. Lewis abandoned interest in sponsorship of the proposed project.

Woodbury became interested in 1951 in the promotion of a house panel invented by an architect, S. C. Horsley. In late 1951, Woodbury financed a trip by Horsley, R. A. Blanchard and G. K. Gosling to Alaska to investigate the possibility of selling the Horsley panel for use in housing in Alaska. In the course of this promotion, plaintiff Lee C. Bettinger, the Mayor of Kodiak, was contacted by Gosling and they interested Woodbury in becoming sponsor for the proposed project in the place of Lewis. In February 1952, Aleutian Homes, Inc. was incorporated by Woodbury under the laws of the state of Oregon and in February or March 1952, the City of Kodiak approved Aleutian Homes, Inc. as the sponsor of the proposed housing project. Thereafter, the Alaska Housing Authority conveyed the land selected for the site to Aleutian Homes, Inc. Woodbury was President and principal stockholder of said corporation. Brice Mortgage Company was selected to act as the permanent mortgagee under Title II, Section 203 of the National Housing Act.

Aleutian Homes, Inc. and Brice Mortgage Company later found it impossible to secure from private sources the financing required for the construction of the project. In 1952 negotiations were had between Brice Mortgage Company, acting on behalf of Aleutian Homes, Inc. and the Community Facilities and Special Operations Branch of HHFA for the purpose of securing an interim loan for construction purposes. A final application was approved in January 1953. This interim construction loan by HHFA was in the sum of $4,230,900.00, which constituted 90 percent of the amount of the FHA and FNMA commitment with respect to the permanent long-range financing, the application indicating the difference between the projected costs and the loan amount applied for would be provided for by the sponsor, Aleutian Homes, Inc. The loan was authorized by a Loan Authorization signed by the Administrator, and carried into effect by documents required by a Building Loan Agreement.

Contractual arrangements for the construction of the project under the interim loan from HHFA were signed on April 27, 1953. In general they provided

as follows: Aleutian Homes, Inc., as the owner, entered into a "general contract" with Kodiak Construction Co. for the construction of the housing project for the payment of the sum of $4,230,900.00 (the total maximum amount of the HHFA loan). Kodiak Construction Co., as general contractor, in turn contracted with three subcontractors, plus a freight company, the total payment under which subcontracts, plus freight, similarly equaled the sum of $4,230,900.00 (the maximum amount of the HHFA loan).

After overcoming what appeared to be insurmountable obstacles, some 341 of the 344 houses in said project were completed and passed final FHA inspection by April 12, 1955. In June 1957 HHFA commenced a foreclosure proceeding on said loan in the United States District Court for the District of Alaska against defendant Aleutian Homes, Inc. and others and thereafter Intervenor Gebhart was appointed Receiver in said proceeding. A more detailed statement of the many difficulties and obstacles faced by the sponsors of this unfortunate project is set forth in Woodbury v. United States, D.C.Or.1961, 192 F.Supp. 924.

Prior and subsequent to the execution of the agreements hereinafter mentioned, plaintiff Bettinger was the principal driving force in securing the public funds with which to go forward with the construction of this project. Since the City of Kodiak was an isolated city in a more or less isolated territory, it was recognized and conceded by all concerned that the only feasible source of funds to construct the project were these which might be obtained from one of the federal agencies above mentioned. All par-

ties recognize that public funds were involved at the time the contracts were made. Bettinger served as a member of the common council of Kodiak from October 1942 to April 1946 and as Mayor of that City from April 1946 to and including the early part of October 1953. For a number of years prior to October 1953, decedent Hugh K. Dougherty was a close business associate of Bettinger and was such an associate during all the time Bettinger was expending his efforts in obtaining funds with which to build public housing for the Naval personnel in Kodiak. The evidence is conclusive that no housing project would ever have been commenced at Kodiak if public funds were not provided. The testimony is clear and convincing that the United States, acting by and through the Navy Department, was vitally interested in the construction of the housing in question. Such a large scale housing project in that city could not be successful unless financed by public funds and supported by Naval personnel. The success of the entire project was premised on the permanency of the Naval base and the ability of the military and civilian personnel of the Navy to pay proper rentals on the housing to be constructed.

The principal contract, the validity of which is challenged in this proceeding, was between decedent Dougherty and defendants Aleutian Homes, Inc. and R. B. Woodbury. The original of the contract was drafted on the 21st day of August, 1952, but did not reach its final form until October of the same year, at which time it was executed by the parties. Important provisions [1] of this contract are set forth below.

1. "WHEREAS, Aleutian is planning to construct and operate as rental units, approximately 385 residential houses, of either single family or multiple family units, on the Island of Kodiak, Territory of Alaska, hereinafter called the 'Project'; and

"WHEREAS, Aleutian has received assurances of a loan, herein called the 'loan', for purposes of constructing the Project and it is contemplated that a commitment for insurance of the *loan*

*from the Federal Housing Administration* will be received; and

"WHEREAS, Dougherty has heretofore expended substantial time and personal funds commencing in the year 1950, in the furtherance and development of the Project, by extensive travel and time spent in order to learn the workings of housing projects, site developments, insurance coverage, operation of projects, feasibility of types of shipping and many allied subjects; all of which have materi-

Bettinger was Mayor of Kodiak at the time this contract was drafted and later signed. He concedes he had an interest in the contract at that time,[2] not formalized, however, until he received an assignment of a 50% interest in the contract on May 18, 1953. He was still Mayor at that time. To be quite charitable, Bettinger's explanation of why he received a 50% interest in the contract is far from convincing. His attitude and conduct on the witness stand while attempting to explain the transactions cast considerable doubt on all his testimony and the correspondence hereinafter mentioned, when read in light of this plaintiff's demeanor on the witness stand, convinces me that in truth and in fact he was the driving force in obtaining the contract and in using his office

ally benefited *Aleutian and Owner*, and is in a position to render invaluable assistance in the future in connection with the development and construction of the Project; and

"WHEREAS, Owner is the owner of more than 75% of the capital stock of Aleutian;

"NOW, THEREFORE, it is agreed:

"I. A. (1) It is contemplated that all construction and development costs of the project shall be paid from the loan, which shall constitute the 'construction fund.'
* * *

*       *       *       *       *

"(3) The difference between the 'construction fund' and the 'construction cost' shall be designated as the 'construction differential.' [Specific items of construction costs and expenses are included in the definition of "construction costs."]

*       *       *       *       *

"B. Dougherty is in a position to further aid the development and construction of the Project and agrees to assist Aleutian in development and construction of the Project. It is contemplated that Dougherty's efforts will contribute substantially to a reduction of the 'construction cost' below that which might be incurred without his knowledge and assistance.

"As an express condition of this agreement, Aleutian agrees to pay Dougherty an amount equal to *22½% of the construction differential*, and further agrees to pay to Dougherty if not otherwise restricted by the Federal Housing Administration or other Federal or Territorial Agency, *an amount equal to 22½% of any said rentals retained by Aleutian as 'moratorium payments'* without obligation of repayment on account of principal or interest on all loans for the Project. The sum of these payments shall be and constitute full and complete compensation for all services rendered by Dougherty in connection with the development and construction of the Project, *but shall in no way limit Dougherty*

*from entering into any further contracts with Aleutian concerning services other than those set out herein.*

*       *       *       *       *

"(2) It is contemplated that Aleutian may construct roads and other utilities under agreement with the City of Kodiak whereby Aleutian shall pay for such installations and receive certain tax refunds or benefits equivalent to the value and in lieu thereof. It is understood that Aleutian *shall pay Dougherty 22½% of the amount representing the tax refunds* or benefits at such times as such benefits shall be realized by Aleutian, these payments to be additional to any other payments specified herein. * * *." (emphasis added)

2. "MR. HILL: Q I show you Exhibit 360 and will ask you what part you had in the negotiations and the drafting and signing of that agreement?

"A Well, I had some discussions in a general way, but I had no part in the drafting or signing of this agreement. In fact, I didn't even see it until sometime after it was signed.

"Q How did it happen that you didn't take an active part in preparing that agreement?

"A Mr. Dougherty was taking care of it, and he employed counsel.

"Q Is there any reason why you didn't take an active part in it?

"A No.

"Q Can you tell the Court why that agreement was entered into in Mr. Dougherty's name alone rather than jointly with you?

"A Because under the original understanding had with Mr. Dougherty he would be performing functions in practically all matters once Aleutian Homes came into the picture. And I agreed that I would assist him in any way that was required. This is all covered in my deposition. Eventually, as the record will show, I continued to perform so much work that eventually I received a 50-per cent assignment to the contract." (Bettinger's Transcript, pp. 47–48)

at the time it was signed. At no time during the course of his service as Mayor did Bettinger inform the city or the city counsel of his undisclosed interest in the tax offsets to be obtained by Aleutian Homes.

Aside from the letters which I shall specifically mention the record contains hundreds of documents which show the extreme interest of Bettinger and decedent Dougherty in the public financing and city activities during the period in question. All of the contacts, as shown by this volume of documents, by Bettinger with the governmental agencies were in his capacity as Mayor of the City of Kodiak. Bettinger, in his personal capacity, claims that he was also acting for the Chamber of Commerce of said city. At no time was a distinction made between Bettinger in his personal capacity and Bettinger as Mayor of said city. It is clear that the government agencies in question would never have approved this project unless they received the official approval of the city. No project could have been constructed without full cooperation of the city with respect to streets, sewers and other such municipal facilities. Of course, the advantage to the City was increasing its tax base, as well as a general improvement in the housing problem. The approval of the City of Kodiak, of which Bettinger was Mayor, was a condition to the loaning of funds by the governmental agencies.

As early as October 1948, Bettinger, as Mayor, was promoting this housing project.[3] This promotion continued through hundreds of letters and many trips to the states and Washington, D. C. during the period when he was Mayor. As an example of this promotional interest and his relationship with Dougherty, I quote from his letter to Dougherty from Washington, D. C. dated January 17, 1952.[4] The salutation on all of the correspondence between Dougherty and Bettinger was by first name. Dougherty's reply [5] to this letter portrays some of the power which Bettinger had over the City council. In this same communication Dougherty expresses some concern with reference to going forward with the construction of the streets and alleys in Kodiak. On February 8, 1952, Dougherty directed

3. Exhibit 1.

4. "Arrived back in Washington Sunday night and found a call waiting for me from Ken. I answered it, and he advised me that they were making good progress and that Waller expected to have the site layout and street plans completed this week. *These plans then must go to the City of Kodiak for certification and also require other action such as dedication of the streets by the sponsor, et cetera.* Don Wilson informs me that as soon as this is accomplished and he receives a set of the plans he will authorize completion of the *final plans for the water and sewer distribution.*

"FHA have advised him that it will be necessary for them to have a letter from Secretary Kimball accepting them as sponsors inasmuch as the present Navy endorsement of the project names Ray Lewis as the proposed sponsor. *It is not advisable to approach the Secretary until such time as all the planning and other paper work is complete so as to demonstrate to him the ability of this group to act.* At that time it would likewise be advisable that some member of the group come to Washington.

\*   \*   \*   \*   \*

"I am anxious to know if you have completed your arrangements with Gosling and his associates. Please advise me so that I can be guided accordingly. With best wishes—." (Exhibit 635) (emphasis added)

5. [Referring to Gosling]
"\* \* \* *He told me that every thing was being held up there until they got from you a resolution from the City council naming them the sponsors.* I told him that I did not expect they would receive that until I was satisfied that they were going ahead with the building. *He seemed to catch on real quick.* He told me that the papers for the corporation were ready to be filed but they were not as yet, etc. etc. Then he asked me to write him what I assumed would be you my arrangement with his people." (Exhibit 121) (emphasis added)

a letter [6] to Gosling which is important on the relationship between Dougherty and Bettinger. It is significant that Dougherty forwarded to Bettinger a copy of that letter with the following comments.[7] Bettinger did not sign the resolution of the City council naming Aleutian Homes as the sponsor of the project, which resolution was dated February 25, 1952. This, however, does not mean that Bettinger was not familiar with or participated in the proceeding. On March 4, 1952, he directed a letter to Dougherty containing language which would clearly indicate that Bettinger was the sponsor of the resolution.[8] The con-

6. "I am in receipt of your letter, the plans, lot lay out, and the letter from Woodbury.

 \*    \*    \*    \*    \*

"It is the disadvantage of our working so far apart; we could not think of all these details when you were here.

"Now on this land price thing: I won't mention names, but consideration is being given to revaluation and there has been talk of putting it out on bid for contractors. This will happen in the future projects I am almost certain. HOWEVER, we are still safe and I know if we can get action in the next week or ten days it is my firm belief we will get it at our price. Time is our greatest danger, and the reasons must be obvious to you.

"Let me give you some strong advice, and I do mean strong: Do not for any reason have your attorney or anyone else start playing politics with Maggie or anyone else in Washington. Ken, you must realize that we covered that field months ago and that situation is in perfect order; the only possible thing that could happen would be to upset the cart. Magnusen has been a particularly good friend of ours and nothing would be worse than to inject anything else there. *Believe me.*

"Don't worry about Public Land. Our friendships there have made this entire deal possible. It is not a matter of pressures but of good sound business on their part and the military. No one is going to upset that in the near future.

 \*    \*    \*    \*    \*

"I can appreciate the difficulty of Mr. Woodbury and his attorney trying to make a contract with a stranger some two thousand miles away. I received their letter in the good faith that I am sure it was written. We will go along here with full steam until this is finished.

"However, my attorney made a sound suggestion and one that we should carry out. It will be about a week before your corporation is finished, and before you can present it up here. That can give you time enough to draw up a contract with me so that when the corporation is finished it can bind itself with Dougherty.

 \*    \*    \*    \*    \*

"To recap some of this: Keep in closer touch with us, Ken. We could have saved you a lot of work so far. Leave the Washington end strictly alone unless you clear it through one of us. We think it is in perfect shape. \* \* \*." (Exhibit 127)

7. "The enclosed copies are self explanatory. I would like to have Kens letter returned to me.

"Please brief me on the transfer of Alleys and Streets.

 \*    \*    \*    \*    \*

"I also have gotten rumbles from Kodiak about your being away, can't see that it means anything at all. They can't all love you.

 \*    \*    \*    \*    \*

"I will keep you closely informed on any actions here abouts. There has been a rumor that all future land transfers for housing will go on a bid basis and I was warned that if we did not act quick, on this one the price would have to go up as it is too low, nothing official and it does not frighten me—yet. I passed it on to Gosling on purpose. \* \* \*." (Exhibit 127)

8. "I should have written to you long before this, but day by day wait for additional developments. I was disturbed by your telegram relative to your lack of a contract with Gosling, et al, so I immediately phoned him. His explanation was that it had taken all this time for the attorneys and accountants to devise the proper corporate entities. *He also advised me that the contract would now be entered into between you and the other parties concerned.*

"From a previous letter of yours I understood that you did have an agreement of sorts, pending incorporation. *On the basis of this, I proceeded with all phases of the project and Aleutian Homes, Inc., has now been officially named as the sponsor.*

 \*    \*    \*    \*    \*

"Ray Woodbury, Ken Gosling and George Brice will arrive in Washington today to meet with the agencies involved, *so we should be able to consummate this matter very shortly.* I shall

tract referred to in the first paragraph must, of necessity, be the compensation contract here in question. This letter, of itself, would almost conclusively establish that the sponsorship of the project by Aleutian Homes was conditional on the approval of the compensation contract in favor of Dougherty and that Bettinger was using his official position as Mayor to require agreement to the compensation contract.

In order to better understand the promotional drive of Bettinger, as Mayor, to secure public housing in Kodiak, I will refer to a few of the documents in evidence.

> advise you further as soon as I have met with these men.
> "I note your comment and Ken's concern about my absence from Kodiak. I know in a Kodiak paper of a later date, *both the City Council and the Chamber of Commerce have given me a vote of confidence. * * *.*" (Exhibit 643)

9. "A * * *
> "The Chamber of Commerce and other business people and myself realized that the salvation of the city was dependent upon having the benefit of the payroll on the Base. If we could have these people living in town and provide housing for additional people, that could build up the taxable wealth and a population that would warrant improvements and better living conditions for all. Also, the City being in the utility business, we would have the additional revenue to our utilities, our dock operation, and every municipal operation—
> "Q May I ask you to specify what utilities you are talking about?
> "A We operated a municipal dock—
> "Q By 'we' you mean—
> "A The City. I am speaking now of the City.
> "Q The City.
> "A Yes. The City operated the municipal dock. And the water system and sewer system, all these, even the sewer system, there were monthly charges to show a profit above the cost of amortization and maintenance. Those were the pincipal sources of income.
>     *     *     *     *
> "Q Excuse me. Was that where the Aleutian Homes Project was built?
> "A Where they eventually were built, yes. Possibly the first efforts were directed to getting some firm understanding

The cooperation of the United States Navy was essential to the success of the project.[9] That Bettinger was a central figure in this promotion is beyond dispute.[10] In its negotiations the Navy was, without question, dealing with Bettinger as Mayor. This was a letter from the District Public Works Officers, Seventh Naval District, to the Chief of the Bureau of Yards and Docks and was dated April 20, 1951. On May 9, 1951, the Acting Secretary of the Navy directed a letter to the Commissioner of Federal Housing Administration which clearly indicates that the Navy was dealing with Bettinger in his capacity as Mayor.[11]

> of how many houses the Navy would support off-base. I say this with modesty, but I instigated this effort. It wasn't the Navy or someone else. And as a result the Navy made surveys and studies, and the documents show the correspondence between them and Washington, D.C., on this subject. And I went to Washington on it, and it eventually appeared that a round figure of 400 homes they could justify. There were many studies to substantiate this. * * *."
> (Bettinger's Transcript, pp. 23, 25)

10. "12. Mr. Lee C. Bettinger, *Mayor of Kodiak*, is on his way to Washington, D.C. to discuss the subject housing project with the Federal Housing Authority and also with the Bureau. It is requested that the Bureau furnish Mr. Bettinger every assistance possible in expediting approval so that this urgently required housing can get under way during the coming construction season. * * *" (emphasis added) (Exhibit 73)

11. *The Honorable* Lee C. Bettinger, *Mayor of the City of Kodiak*, Alaska, on 2 May 1951, addressed the Secretary of the Navy concerning a proposed housing project for the City of Kodiak. *Mayor* Bettinger says that the Federal Housing Administration requires certain information before final approval of the above-mentioned housing project will be granted by FHA. * * *
> "Mayor Bettinger also informed this office that the Commissioner required certain assurances before ultimate approval of the proposed housing project could be obtained. * * *
> "The Navy Department has been told, both by Mr. Lee C. Bettinger, Mayor of

There is no doubt that Bettinger used his influence as Mayor of Kodiak to obtain the necessary action from the Navy Department.[12] This letter is signed by Bettinger as Mayor of Kodiak, Alaska. The letter from the Under Secretary of the Navy to the Commissioner of FHA dated March 31, 1952, is further evidence of the fact that the Navy was influenced by Bettinger's promotion in his official capacity.[13] The letter from Bettinger to Dougherty of January 23, 1952 further supports this view.[14] This letter clearly indicates that Dougherty expected Bettinger to secure a proper resolution from the City council naming Woodbury as sponsor and makes clear that one of the things the Aleutian group wanted from Dougherty and Bettinger as consideration for the contract was a proper resolution naming Aleutian as sponsor. It is also quite apparent that Dougherty and Bettinger were not going to permit the passage of the resolution until they were assured of a satisfactory compensation contract for their services. On February 8, 1952,[15] Dougherty so stated in a letter to Bettinger. Another

the City of Kodiak, and Mr. Ray Lewis, representing the sponsoring group, that the sponsors have agreed to assure priority of occupancy for military personnel. Mayor Bettinger says that his provision is part of an agreement between the City of Kodiak, and the sponsor. * * *." (Exhibit 86)

12. "In May of 1951 I discussed with you the matter of a private rental housing project in Kodiak, Alaska, for the occupancy of military personnel. * * *

"* * * By December of 1951 it was apparent that Mr. Lewis and his associates could not perform and that we must immediately negotiate with other sponsors in order to be assured of construction during the 1952 season.

"We immediately commenced negotiations with a Portland, Oregon, group headed by Mr. Ray Woodberry. We first satisfied ourselves that they were qualified as to construction experience and financial ability. We required that they perform all the necessary engineering, architectural work and arrange their financing program before we would endorse them. By February 25, 1952 they had qualified and the City of Kodiak endorsed this sponsor, Aleutian Homes Incorporated, by Resolution No. 8–52, a copy of which is enclosed.

* * * * *

"We have refrained from submitting this matter to you until such time as we had taken every step possible to assure completion of the project. We have complete confidence in this sponsor, his sincerity, and his ability to perform. We can proceed no further without your assistance.

"Under date of May 9 and June 6, 1951 you addressed two communications to the Honorable Franklin D. Richards, Commissioner, Federal Housing Administration, relative to this project. Upon the basis of both communications, the FHA was prepared to issue commitments for title insurance on the Kodiak Housing Project. Due to the fact that there has been a change of sponsorship, the FHA now require a similar communication relative to the Aleutian Homes as sponsors. I trust that you will honor this request at your early convenience. * * *." (Exhibit 147)

13. "The Honorable Lee C. Bettinger, Mayor of the City of Kodiak, Alaska, has brought to my attention the necessity for a further statement from the Navy Department concerning a proposed rental housing project at Kodiak. * * *

* * * * *

"Mr. Ray B. Woodbury, President, Aleutian Homes, Inc., the new sponsoring corporation, has repeated the assurance previously given by the former sponsor, that in the renting of this housing Naval personnel will have a first priority. * * *

"As you are doubtless aware, the need for additional housing on Kodiak Island continues to be critical. * * *

"With regard to Navy housing requirements, conditions at Kodiak, Alaska, are essentially the same as in 1951. * * *

"With this re-affirmation of the need for adequate housing for Naval personnel at suitable rentals, *I trust that your office will act favorably upon the applications filed by Aleutian Homes, Inc. for mortgage loan insurance under Title 203 of the National Housing Act.*" (emphasis added) (Exhibit 158)

14. Exhibit 121.

15. "They sent me a letter of intent instead of a contract, it is sufficient for the moment but I believe my letter to them explains my position correctly."
(Copy of letter to Gosling states: "* * * We will go along here with a full head of steam until this is finished. * * * I would like to suggest that if

from Woodbury to Gosling dated June 13, 1952, sheds further light on the subject.[16] Of the $5,000.00 received by Dougherty on June 13, $3,000.00 was turned over to Bettinger to apply on his expenses on the Kodiak housing project.[17] However, Dougherty was not satisfied and wrote to Bettinger on July 6, 1952 with reference to the compensation contract.[18] Therefore, within one month of the draft of the written compensation contract, Dougherty and Bettinger felt that the only way to force the execu-

it seems too difficult to *work up the contract* that one of you should come up here for a few days. *From our point of view* this contract *has to be executed before we go too far* and I know each of you can appreciate that attitude.") (emphasis added) (Exhibit 127)

16. "On Tuesday of this week Mr. Daugherty advised me that he had reconsidered our negotiations and was advising Mr. Bettinger to cease all activities in our behalf.

"* * * I told him * * * I was sure it would be foolish to talk any more about selling out as it would be wasted time. He then stated that he was *going to ask Lee to withdraw* and he was sure that I would not be able to build any houses in Kodiak. I told him that he might be right but I was certainly going to try to build them. He based his action on claiming a breach of faith in that the $20,000 was not forthcoming immediately. I reiterated that if there was any breach of faith it was on the part of *Mr. Bettinger* in that we were now obligated to take care of matters *that he originally assured us he would handle; namely, roads.*

"After talking to me Daugherty talked to Don Layman. Layman had me meet them at the Aero Club for dinner Tuesday night. He confirmed his fears that Lee and Hugh could cause us a lot of trouble and delay through his connections with the Government Agencies, also they would probably stir up the city authorities in Kodiak as well as the plumbing and electrical bosses. These things were probably true. * * *

"* * * I thereupon offered to pay *$5,000 to Daugherty now and another $5,000 to Daugherty when you had obtained title to all the privately owned*

tion of such a contract was to stop all cooperation. That Bettinger sought and obtained the services of his close personal friend, Dougherty, in connection with working out the details of the transaction there can be no doubt.[19] Although the City of Kodiak paid large sums for Bettinger's expenses in connection with the promotion of this project, he attempts to discard the mantle of Mayor at convenient times and thus assume to act in his personal capacity, all in connection with the same subject. I again quote

*land in the East Addition to Kodiak.* This offer was acceptable to Daugherty and at a conference in Bert Gooding's office yesterday the money was turned over to him and receipt obtained. * * * " (Exhibit 191) (emphasis added)

17. Exhibit 652.

18. "This is a difficult letter to write because there is so much involved with Ray W. that I can't understand. The point is that we still do not have a contract.

\* \* \* \* \*

"I told Ray today that since he has stalled for 5 months on a contract we would of necessity be forced to slow down our efforts until an agreement is reached.

\* \* \* \* \*

"Lee—I don't want to sound too discouraging. This is going to work, *but* there seems to be only one language Ray understands and we had better use it right now.

"A sudden and complete lack of co-operation is needed and will get results. * * *." (Exhibit 199)

19. "Q Commencing, then, in late '50 or early '51, what was done at that stage? "A It appeared then that such a project could be built. There were other problems yet, but those were the principal problems.

"Q What did you then do if anything? "A During the latter interval of this, I was a close personal friend of Hugh Dougherty's. As it appeared that such a program could be put over, *I enlisted Mr. Dougherty's aid,* asked him to devote his time to contacting a prospective sponsor." (Emphasis added) (Bettinger's deposition, p. 38)

from his deposition.[20] Of course, there is no intelligent way of fixing the dividing line between Bettinger's actions and functions as Mayor of the City and his actions and functions as an individual.

## FIRST CAUSE OF ACTION

■ Plaintiffs' first cause of action is based on the provisions of the questioned contract which would require defendants to pay 22½% of the "construction differential" as defined in the contract. The parties are not in agreement on what is meant by "construction differential". Defendants and intervenors contend that the "construction differential" as defined by the contract is the difference between the amount of the HHFA loan and the cost of construction as defined in the agreement. Counsel for plaintiffs concede that if this interpretation is correct, such an agreement would be in violation of law and plaintiffs' first cause of

action would fail. Plaintiffs contend that on a proper interpretation of the contract the "construction differential" would be the difference between the FNMA loans and the amounts expended to repay the construction loan and any construction costs beyond the amount of the loan. The evidence convinces me that all parties originally construed the language of the agreement in accordance with defendants' interpretation. For instance, on May 17, 1953, Dougherty, by letter to Bettinger, indicated great concern over the fact that the subcontracts issued by Aleutian amounted to 100% of the commitment.[21] Along the same line is a letter dated May 18, 1953 from Dougherty to Bettinger.[22]

On January 15, 1953, the Administrator authorized the construction loan. The authorization to defendant Aleutian Homes specifically provided that the proceeds of the loan should be used by the

20. "Q Now, in the course of your dealing with various government agencies that you described between 1948 and the end of 1951, which is the period we covered yesterday afternoon, did these officers know that you were the mayor of Kodiak?

"A Oh, yes.

"Q Did you approach them as the mayor of Kodiak?

"A Specifically sometimes yes and other times no.

"Q The correspondence which you spoke about, was this as mayor of the City of Kodiak?

"A Some of it, yes; some of it, no.

"Q What made you determine when to act as mayor and when to act not as mayor?

"A I don't know that there was any compelling reason except I knew many of these people as the mayor of Kodiak because I dealt with them on other business in a city capacity.

"Q Did your contacts with these people arise out of your being mayor?

"A Some of them, yes." (Bettinger's Deposition, p. 72)

21. "* * * Point 1, as you know they have given us the story that in order to finance and satisfy HHFA they had to make firm contracts for 100% of the commitment. Then they tell me that they have a deal with each contractor that

amounts to a kickback and that that will be the profit.

\* \* \* \* \*

"Tomorrow I am asking Mac to write Ray two letters. The first will be a formal protest at this time of the manner in which these contracts have been given, without open bid etc. This will be to protect us of course if there is no rebate on these contracts to us. * * *." (Exhibit 326)

22. "* * * As I wrote you yesterday the figuring of those contracts leaves *nothing for us* and all I have is Dons word that another subrosa deal has been made with the contractors and we will get ours from that. I would hate like hell to have to prove that in court—they could never admit it.

"* * * Frankly, Lee, he should at this time make an entirely new agreement with us covering this faze of it * * *. This is damned serious and if Don is there when you receive this you should cover it with him, we just cannot take Dons word on this—Woodbury can fire him tomorrow.

\* \* \* \* \*

"* * *, I feel strongly that Ray should at this time be set right and completely right on our construction contract. As it stands it is not worth a dime and ninety days from now it should be all over. * * *." (emphasis added) (Exhibit 327)

borrower solely to finance the purchase, construction, including site preparation, and erection of 344 single-family prefabricated houses, and that the borrower would use the proceeds of the loan solely for the purposes therein authorized. Resolutions were adopted by the directors and stockholders of Aleutian accepting the loan authorization upon the terms and conditions prescribed.[23] On April 27, 1953, pursuant to the above loan authorization, a building loan agreement was executed which required the borrower to abide by the loan authorization and directed that the said proceeds of the loan be disbursed by HHFA. In the agreement the borrower agreed not to assign the rents of any of the dwellings on the project and that no part of the proceeds of the loan could be used except for the purposes provided in the loan authorization and, in particular, that such proceeds should be used only to finance the procurement, transportation, construction and completion of the housing project, consisting of 344 single-family prefabricated houses.[24] The deed of trust [25] contains a pledge to the administrator of all of the rents and profits to secure the indebtedness to the administrator. Plaintiffs do not claim a lack of knowledge of these loan restrictions.[26]

From all of the evidence in the case I would and I do hold that the "construction differential" mentioned in the compensation agreement is the difference between the amount of the HHFA loan and the costs of construction as defined in the agreement. However, I feel that under either construction, this provision of the contract is against public policy and void under the facts of the case and the authorities which I will now analyze. The contract in question being one which provides for payment of a percentage of funds derived from federal agencies under contracts with the United States should probably be controlled by the decisional law of the United States courts rather than the laws of any state. United States v. Allegheny County, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209; S. R. A., Inc. v. State of Minnesota, 327 U.S. 558, 564, 66 S.Ct. 749, 90 L.Ed. 851; United States v. Jones, 9 Cir., 1949, 176 F.2d 278. However, my decision would be the same whether the contract is construed in the light of the decisional or statutory law of Alaska, Oregon or the United States.

The bell-wether case of the United States Supreme Court is Providence Tool Co. v. Norris, (1864) 69 U.S. 45, 17 L.Ed. 868. In that case defendants sold certain guns to the United States and the plaintiff claimed a right to compensation on such sale. The government's contract with the defendant was secured through the efforts of the plaintiff. The plaintiff's services consisted principally of using his influence with certain senators. In passing on the question Mr. Justice Field viewed the contract as one for compensation in connection with procuring legislation and adhered to the general rule that such contracts were uniformly invalid and that the decisions never turned on the question of whether improper influence was actually contemplated or used, but rather on the corrupting tendency of the agreements themselves. Justice Field pointed out that whatever tended to divert the attention of legislators from their high duties or to mislead their judgments or to substitute other motives for their conduct than the advancement of the public interest itself, would necessarily and directly tend to impair the integrity of all our political institutions. He also pointed out that there was no real difference in principle between agreements to procure favors from legislative groups than there was to procure favors in the nature of contracts from the heads of governmental departments. That the plaintiff Bettinger had in mind the use of his pow-

23. Exhibits 502, 503.

24. Exhibit 314.

25. Exhibit 313.

26. Exhibits 325, 326.

er as Mayor is established by substantial evidence.[27]

Plaintiffs make some claim that the real sponsoring agency was the Alaska Housing Authority and that the City of Kodiak had little, if anything, to do with the ultimate grant of the loan. The documentary and other evidence is directly contrary to this contention. The role of the City of Kodiak was absolutely essential to the success of the project. The record clearly shows that the City was permitted to select, designate and approve the sponsor and that the Navy and FHA relied upon the approval of the City in making their certifications and commitments. Likewise, it is undisputed that the Bureau of Land Management, the Alaska Housing Authority and HHFA depended, to a large extent, upon the official approval of the City of Kodiak. It was left up to the City to secure the necessary land and the cooperation and approval of the City with reference to sewers, water systems, schools, rural electrification and other matters were absolutely indispensable.

Providence Tool is cited with approval by the Oregon Supreme Court in Hyland v. Oregon Hassam Paving Co., (1914) 74 Or. 1, 144 P. 1160, L.R.A.1915C, 823. In that case the plaintiff and the defendant entered into a contract under the terms of which the plaintiff was to be compensated in an amount equal to 3% of the contract price on future agreements with reference to public works between defendant and the City of Portland. In passing on the question and in declaring the contract invalid, the Oregon court held that public policy required councilmen to act solely from considerations of public policy and with an eye only to public interest. It was there held that courts uniformly hold void and illegal contracts for services that involve personal influences on lawmakers.

Plaintiffs' argument that Hyland v. Oregon Hassam Paving Co., supra, is overruled by Herrick v. Barzee, 96 Or. 357, 190 P. 141, is without merit. As a matter of fact, the Hyland case is cited in support of the Herrick decision. The facts in the Herrick case are entirely different from the facts before me.

The statutory law of the Territory of Alaska prohibited the very type of conduct here in question.[28] In my opinion this statutory law is nothing more than a restatement of the decisional law of the United States Supreme Court and the Supreme Court of the state of Oregon in the decisions above mentioned. The most recent case on this subject is United States v. Mississippi Valley Generating Co., (1961) 364 U.S. 520, 81 S.Ct. 294,

27. " * * * Of course if I am defeated it will complicate our deal, so I had been most anxious to get a deal signed with someone before election. * * *." (Exhibit 626)

[Referring to the date Bettinger's term expired]

" * * * Of course if I am not in office there is no way to control any deal. A deal has to be made before that date.
* * * * *
"I am ready to make a deal with anyone, * * *." (Exhibit 628)

28. Alaska Compiled Laws, Section 65–7–5
"*Accepting bribe.* That if any judicial or executive officer shall corruptly accept or receive any gift, gratuity, valuable consideration, or thing whatever, or any promise thereof, or any promise to do or cause to be done any act beneficial to such officer, with the understanding or agreement, express or implied, that such officer will give his vote, opinion, decision, or judgment in a particular manner in any matter, question, duty, cause, or proceeding which then is or may by law come or be brought before such officer, or with the understanding or agreement that such officer will in his official capacity act in a particular manner, or so as to produce or prevent any particular result, such officer, upon conviction thereof, shall be punished by imprisonment in the penitentiary not less than five nor more than fifteen years."

Alaska Compiled Laws, Section 65–7–7
" *'Executive officer' defined.* That every officer of said Territory, or of any county, town, or other municipal or public corporation therein, not included in the definition of judicial officers, as defined in section 65–7–6, from the time of his election or appointment, shall be held and deemed to be an executive officer within the meaning of sections 65–7–4 and 65–7–5, and for the purposes herein expressed."

5 L.Ed.2d 268, which case approves the decision in the Providence Tool case.

Plaintiffs' counsel concede that the holding in the Providence case and the other cases cited by defendants would, if such decisions were not confined to the facts in the particular case, preclude a recovery by plaintiffs in this cause of action. However, plaintiffs' counsel earnestly contend that the court in the Providence case went far beyond a decision which was necessary on the particular facts and that the rule as there announced has since been abandoned, at least, where there is no specific showing that the contract required, or that the parties contemplated, an improper influence would be used, or that such influence was, in fact, brought to bear upon a government officer.

Plaintiffs argue that the prevailing rule is that contingent agreements to make sales to a governmental body are not offensive to public policy because of the mere possibility that sinister or corrupt influence may be used in the performance. They argue that there must be proof that something contrary to good morals was contemplated or done and that otherwise public policy permits parties to make lawful contracts and requires them to perform or answer in damages for their breach. Plaintiffs cite Coyne v. Superior Incinerator Co. of Texas, 2 Cir., 1936, 80 F.2d 844; Stanton v. Embrey, 93 U.S. 548, 23 L.Ed. 983, and Valdes v. Larrinaga, 233 U.S. 705, 34 S.Ct. 750, 58 L.Ed. 1163, in support of their contention that the language of the Providence case no longer controls. That the cases cited by plaintiffs limit the application of Providence Tool is beyond question. However, I feel and hold that the contract in question would have a sinister and corrupting influence. Permitting the mayor of a city to enrich himself by entering into side participation agreements, such as those here in question, would be doing nothing more than inviting the mayors of every city in the union to use their political influence to obtain an interest in public contracts and thus enrich themselves. The courts cannot sanction this type of conduct. Other cases have been cited by plaintiffs. On careful analysis the decisions in these cases would not permit a recovery by these plaintiffs. The governmental regulations cited by defendants and intervenors may, or may not, apply to this factual background. I leave that question for future decision.

Another instrument which the plaintiffs contend supports their first cause of action, but which I believe tends to further destroy it, is the letter of October 7, 1953, from Aleutian Homes and Woodbury to Bettinger, in which Aleutian Homes attempts to guarantee to Bettinger a minimum return of $25,000.00 from the construction differential on the definite assurance that adequate steps would be taken with the City council to see that it reconfirm a tax offset to repay any money which might be expended by Aleutian Homes in the preparation and construction of certain roads.[29] This communication only adds fuel to the already

---

**29.** "Mr. Lee Bettinger
"Kodiak, Alaska
"Dear Mr. Bettinger:
"I understand that upon proper assurance from us you will see that adequate steps are taken with the city council to see that they reconfirm that Aleutian Homes will be accorded a tax offset to repay money expended for East Addition roads. I also understand you will immediately take steps to work out with Don Wilson the desired change in the sewer and water program.
"In consideration of your doing the above we herewith guarantee you a minimum return of $25,000 from the construction differential, such money to be paid you before distribution of any of the fund to any other parties. Upon payment of the $25,000 to you your 22½% participation will be charged with the amount given you so that it will not be paid twice. The excess over $25,000 will be paid you in accordance with our agreement.
"Trusting that the above can be accomplished promptly, I am
"Very truly yours,
"ALEUTIAN HOMES, INC.
"/s/ R. B. Woodbury"
(Exhibit 386)

blazing furnace of invalidity. In any event, this letter was a mere guarantee of a minimum payment under the principal contract and, since the parent contract was void, the court should not attempt to give life to its offspring. The explanation given by the plaintiff Bettinger and his witness Lehman is not convincing and I hold that the alleged guarantee is no more enforceable than the original contract.

## SECOND CAUSE OF ACTION

■ Plaintiffs' second cause of action is premised on that part of the agreement dated in October 1952 which provided that Aleutian should pay to Dougherty 22½% of the amount representing tax refunds or benefits with the City of Kodiak which might result as an outgrowth of Aleutian's construction of roads and other utilities for said City.[30] Subsequent to the execution of the compensation contract the City of Kodiak and defendant Aleutian Homes, Inc. entered into a contract on March 24, 1954, for the construction by Aleutian of the streets and other utilities contemplated by the original contract, this latter agreement reciting, among other things, that the original commitments with reference to the street construction and the furnishing of materials were made on the 4th day of May, 1953, at which time plaintiff Bettinger was still Mayor of the City of Kodiak.[31] In other words, the street construction agreement between Aleutian and Kodiak merely carried into effect what was anticipated between the parties at the time the compensation agreement was executed in October 1952. Since I have already held that a portion of the principal contract was void as against public policy, I could, without further comment, declare the entire agreement void on the well settled principle of law that where part of the consideration for a contract is contrary to public policy, the whole contract must fail. Hazelton v. Sheckells (1906) 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939; Providence Tool Co. v. Norris, supra.

However, there are other potent and valid reasons for declaring invalid the "tax refund" provision of the contract. Here, we are not concerned with funds coming from a governmental agency over which Bettinger had no control. On the "tax refund," which in reality amounted to a tax credit, the City of Kodiak was directly involved and Bettinger would be receiving a percentage of funds which under normal circumstances should rest in the treasury of the city of which he was Mayor. This is the type of conduct which is specifically condemned by the Alaska statute. Aside from the statutory law of Alaska, the universal rules of common law condemn such conduct and declare void contracts growing out of such actions on the part of officers of municipalities. Providence Tool Co. v. Norris, supra. The overwhelming weight of the evidence supports the defendants' contention that the agreements supporting this cause of action are void as against public policy and therefore unenforceable. That this tax offset or refund was long contemplated by the plaintiffs and was part of the entire scheme is clearly shown by the letter dated March 24, 1952 from Dougherty to Bettinger.[32] Likewise, this is shown by the letter from the Kodiak city attorney to Brice Mortgage Company dated May 6, 1952, in which it is said, "the cost of these streets must be held within reason due to the tax advantage to Aleutian Homes, Inc., *which we have already agreed to*." This shows without question that the construction of the city streets and the tax advantage to Aleutian Homes

---

30. See Footnote 1, par. C(2) of the Contract.

31. Exhibit 405.

32. " * * *  I called Don and Ken and had them over for coffee and sold them the idea of knocking off the car ports * * *  using the money for streets, *getting a tax set off from the city for doing it, and selling the idea to FHA.* * * *
" * * *, they will get the profit on the job, then the tax set off will build as a separate fund in the management corp: * * *" (Emphasis added) (Exhibit 353)

and the tax refund were all tied into the same transaction.

### THIRD CAUSE OF ACTION

■ This cause of action involves the 22½% of the moratorium rental payments provided for in the original contract.[33] I might again invoke the rule that a portion of the consideration for the original contract is void as against public policy, therefore the entire contract must fail. Certainly, the rule would be applicable with reference to this third cause of action. However, I feel that the plaintiffs secured their interest in the "moratorium rentals" in the same manner and by the same means as they secured their alleged interest in the "construction differential" and the "tax refunds". This provision was inserted in the contract by reason of the power and prestige of Bettinger as Mayor of Kodiak and it is void and unenforceable for the same reasons as mentioned in the first cause. The statutes of the Territory of Alaska and the cases previously cited support this view.

### FOURTH CAUSE OF ACTION

■ The fourth cause of action is based on a communication dated September 12, 1953, addressed to Dougherty and signed "Aleutian Homes by G. K. Gosling, Vice President."[34] It will be observed that the cause of action is stated on the alleged settlement contract, rather than on what was claimed to be the original management contract. From the evidence produced at the trial I would and I do hold that there never was a meeting of the minds on the alleged settlement contract. This is definitely demonstrated by the telegram from Woodbury to Lehman and Gosling dated September 17, 1953. However, the specific issue before me at this time, which I should decide, is whether the original management contract between Dougherty and Aleutian Homes was permeated with the invalidity of the other transactions. At first glance, it would appear that the writing confirming the oral understanding dated August 25, 1952, would deal entirely with services performed by Dougherty.[35]

However, an examination and analysis of the documentary evidence and the oral testimony convinces me that the contract with reference to hiring Dougherty as manager of the project was part and parcel of the original scheme to use Bettinger's position as Mayor of Kodiak

---

33. See Footnote 1, par. C(2) of the Contract.

34. Exhibit 383.

35. "Dear Mr. Dougherty:

"This letter is being written to you as confirmation of the oral understandings which have existed between the undersigned, Aleutian Homes, Inc., and yourself regarding the management of the project in Kodiak to be known as the Aleutian Homes Housing Project.

"Because of the valuable services which you have given to us in the past, such services, in part, being supplied by virtue of the extensive traveling and time and money consumed by you to familiarize both yourself and the undersigned with the proper management of housing projects, the undersigned does commit himself as stated below, and does further state his intention to commit Aleutian Homes, Inc. to all of the proportions herein set forth. Upon the completion of the housing project in Kodiak, or at a time before said completion if it is found necessary, Aleutian Homes, Inc. will employ you as sole general manager of the entire project. It is contemplated that the management by you and the subsequent contract which will hire you, shall have a term of 20 years. It is further felt that because the undersigned is not at the present time able to adequately or properly decide upon the compensation to be paid you, it is contemplated that such compensation shall be decided between the undersigned and yourself at some date in the future. If this is found to be impossible, then the undersigned will agree to an arbitration method of determining the amount to be paid. It is further understood that the undersigned will enter into a contract concerning the subject matter herein within 60 days from the date hereof.

"Very truly yours,
"Aleutian Homes, Inc.,

"/s/ R. B. Woodbury

(Exhibit 358) "By Ray B. Woodbury"

to influence legislation of the city and withhold consent to proper legislation until side participation agreements were signed. The actions of the parties in this case follow the pattern set by their actions on the principal contract. Here, as under the principal contract, Bettinger obtained a 50% interest by an assignment dated October 31, 1953.[36]

From the very beginning it would appear that the management contract was an essential part of the entire transaction. As early as January 23, 1952, Dougherty, in his letter to Bettinger, indicated that this subject was part of the entire program.[37] On February 5, 1952, Woodbury assured Dougherty of the management contract.[38] Even the principal agreement recognizes that Dougherty is to enter into a contract with Aleutian for services other than those therein set forth.[39] On August 6, 1952, Dougherty informed Bettinger that the only point of conflict with Woodbury was on the management fee.[40] In this same communication Dougherty freely discusses all of the other items contained in the original contract. From the record before me it would seem rather clear that the only reason the management contract was not mentioned in the original agreement between Dougherty and Aleutian Homes is that the parties were unable to agree on a management fee. The letter, which is the basis of this claim, was signed just four days after the drafting of the original contract, but before the execution of the original contract by Woodbury. The letter did not settle the amount of the management fee but left that matter to negotiations by the parties or to arbitration if they failed to agree. The amount of the fee to be paid continued to be a problem. Up to the point of signing the letters, it would seem that the only thing involved was a reasonable fee for services that might be performed. On May 4, 1953, Dougherty again wrote to Bettinger about his difficulty in securing a fixed fee but assured Bettinger that he was working on the problem.[41]

That the management contract amounted to nothing more than a method of giving Dougherty and Bettinger additional compensation for services performed in making the project possible is quite clearly shown in the language of a post script to a letter from Dougherty to Bettinger dated May 13, 1953.[42]

In a communication of May 17, 1953, to Bettinger, Dougherty was concerned over the fact that the management contract was still open.[43]

36. Exhibit 551.

37. " * * * Then he [Gosling] asked me to write him what I assumed would be ƒou my arrangement with his people.
"This I will do immediately but not in detail. This was all settled before he left here and he knows as well as I do what it includes. I shall send him a letter simply stating that those original conditions were satisfactory, that I want management, insurance, shopping center, etc. * * *." (Exhibit 121)

38. Exhibit 351.

39. "B. * * *
" * * * shall in no way limit Dougherty from entering into any further contracts with Aleutian concerning services other than those set out herein." (Exhibit 360, Section B)

40. Exhibit 199.

41. Exhibit 320.

42. "P.S.
"Lee—after writing the above I called Mac to check my facts.
"He states that a contract for any amount that would relieve us of our duties would be unenforceable by us.
"His suggestion is that if we cannot come to terms I make a contract with Ray to be a public relations man or something else, but not to take a management contract that implies or allows us to do nothing—Ray would have us out of the picture within a year." (Exhibit 325)

43. " * * * Don has assured me the management contract will be signed in three weeks. On the strength of that I have tied down a manager—brother if that contract is not signed in three weeks, I am going to recommend some pretty strong moves *on our part*.
"From all that has transpired, if these fellows are on the level, everything is

Another communication which demonstrates beyond question that the management contract was an essential part of the entire compensation program and that Bettinger had an interest in the contract during the time he was Mayor is the communication from Dougherty to Bettinger dated May 18, 1953, in which he evidently encloses the assignment to Bettinger of the 50% interest in the subjects covered by the original contract. This assignment excepted and reserved any monies received by reason of a management contract. In explaining this reservation, Dougherty indicated that the only reason the management contract was not included was that they did not have one.[44] It is clear from Bettinger's own testimony that the management contract was always joint between them and that they contemplated that either one of them might have been manager.[45]

I find that the management contract was obtained by the same illegal means as the other agreements and that it was an essential part of the entire scheme to control legislation of the City of Kodiak. Having so found, I further find that the alleged contract in settlement of the management contract was permeated with the same tainted consideration and is entirely void and unenforceable.

Quotations from dozens of other exhibits and from the testimony of Bettinger and other witnesses could be cited in support of my general findings that all of the contracts are tainted with illegality to such an extent that they are void and unenforceable. Such quotations would greatly lengthen this opinion and would serve no useful purpose to counsel or the courts.

On all of the evidence in the case I find all factual issues in favor of defendants and intervenors and against the contentions of plaintiffs. This opinion and the admitted facts in the pretrial order shall stand as my findings of fact and conclusions of law.

Plaintiffs' complaint and this cause shall be dismissed with prejudice.

allright. I believe we can get out of some of the risk we are taking now by demanding further contractual guarantees on the promises made before this goes any further. * * *." (Exhibit 326) (emphasis added)

44. " * * * On the Management contract: I did not like the manner in which Don tried to pin me down to six thousand over long distance. He knows better than that. The national average for such fees is $2.40 per year per unit. That Lee is in Metropoitan centers. I am positive they were aware of this when they made that offer. My figure of ten thousand, believe me, is very very fair to both sides.
"*On the assignment Lee I did not include the management contract because we don't have one. You will realize that I have no idea yet what is going to be gross and what is to be net on that contract. As soon as we get it settled, and Lehman gave me his word it would be done by next week—I will complete another assignment.*

* * *." (Exhibit 327) (emphasis added)

45. Bettinger's Transcript, pp. 106, 107–108.
"Q Why did Mr. Dougherty execute this assignment, would you tell the Court?
"A As a settlement of our joint efforts.
*           *           *           *           *
"Q What other consideration did you give to Mr. Dougherty to obtain this assignment?
"A It was a joint settlement in connection with the management contract also. We decided we would just—he would give me 50 per cent of everything. It was a settlement of our joint efforts in behalf of Aleutian Homes.
"Q I see. Did you make this settlement with him at the time he was ill in the hospital?
"A Yes.
"Q I am sorry?
"A Yes, sir. It was at his suggestion because he would be unable to carry on."